IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: _____**

**Filing Date: September 5, 2013**

**Docket No. 33,635**

**BRYANNA PEARL BAKER, LORRICE GORDON,**
**and PAUL CAMPOS, as Personal Representative of the**
**Estate of CHERI WILSON, deceased,**

**Plaintiffs-Petitioners,**

**v.**

**STEPHANIE HEDSTROM, M.D.; SOUTHWEST PERINATOLOGY;**
**WILLIAM RAMIREZ, M.D.; LEE C. CARUANA, M.D.; FAMILY**
**PRACTICE ASSOCIATES, P.C.; MISBAH ZMILY, M.D.; MISBAH**
**ZMILY, P.C.; CORDELL HALVERSON, M.D.; SAN MIGUEL HOSPITAL**
**CORP., d/b/a ALTA VISTA REGIONAL HOSPITAL; THE BOARD OF REGENTS**
**OF THE UNIVERSITY OF NEW MEXICO, as Trustees of the**
**UNIVERSITY OF NEW MEXICO HEALTH AND SCIENCES CENTER;**
**JOHN DOE #1-20, and JANE DOE #1-20; ABQ HEALTH PARTNERS, L.L.C.;**
**LORETTA CONDER, M.D.; LORETTA CONDER, M.D., P.C., a corporation;**
**OMKAR TIKU, M.D.; and OMKAR TIKU, P.C., a corporation,**

**Defendants-Respondents.**

**ORIGINAL PROCEEDING ON CERTIORARI**
**Abigail P. Aragon, Sarah M. Singleton, and Alan M. Malott, District Judges**

McGinn, Carpenter, Montoya & Love, P.A.
Tyler John Atkins
Randi McGinn
Albuquerque, NM

Law Offices of Felicia C. Weingartner, P.C.
Felicia C. Weingartner
Albuquerque, NM

The Kauffman Firm
Cid Dagward Lopez
Albuquerque, NM

1

The Vargas Law Firm, L.L.C.
Ray M. Vargas, II
Erin O'Connell
Albuquerque, NM

Law Office of Stephen Durkovich
Stephen G. Durkovich
Santa Fe, NM

for Petitioners

Hinkle, Hensley, Shanor & Martin, L.L.P.
Dana Simmons Hardy
William P. Slattery
Albuquerque, NM

Lorenz Law
Alice Tomlinson Lorenz
Albuquerque, NM

Sharp Law Firm
Lynn S. Sharp
Albuquerque, NM

Butt, Thornton & Baehr, P.C.
Emily A. Franke
W. Ann Maggiore
Albuquerque, NM

Miller Stratvert, P.A.
Jennifer D. Hall
Albuquerque, NM

Krehbiel Law Office, P.C.
Lorri Krehbiel
Albuquerque, NM

Allen, Shepherd, Lewis, Syra & Chapman, P.A.
Edward W. Shepherd
Albuquerque, NM

Serpe, Jones, Andrews, Callendar & Bell, P.L.L.C.
Melanie L. Frassanito
Houston, TX

2

for Respondents

**OPINION**

**VIGIL, Justice.**

**{1}**    This appeal concerns whether defendant professional corporations and a limited liability company are "health care providers" as defined by the Medical Malpractice Act ("MMA" or "the Act"), NMSA 1978, Sections 41-5-1 to -29 (1976, as amended through 2008), so as to be able to receive the benefits of the Act.  Although the Court of Appeals determined that Defendants do not literally meet the Act's definition of "health care provider," it nonetheless held that the Defendants are health care providers under the Act because a strict adherence to the plain language of the definition would conflict with legislative intent. *Baker v. Hedstrom*, 2012-NMCA-073, ¶ 40, 284 P.3d 400. Applying the rules of statutory construction, we hold that Defendants are health care providers under the Act. Although the Court of Appeals reached the same conclusion, we disagree with the Court's determination that the definition of "health care provider" literally excludes Defendants. We conclude that several provisions in the Act indicate that the Legislature intended professional medical organizations like Defendants to be covered by the Act. Accordingly, we affirm the Court of Appeals albeit on different grounds.

## I.    FACTS AND PROCEDURAL HISTORY

**{2}**    This appeal involves three consolidated cases–*Baker v. Hedstrom*, *Gordon v. ABQ Health Partners, LLC*, and *Campos v. Conder*–in which individual plaintiffs brought suits for damages caused by the medical malpractice of their doctors and the business organizations under which each doctor operated.

**{3}**    In *Baker*, Plaintiff Bryanna Baker filed suit in the Fourth Judicial District Court against her doctors for medical malpractice after they failed to disclose the results of a test revealing that she had a medical condition that could be dangerous to both mother and child if she became pregnant. She subsequently became pregnant and suffered a heart attack that went undiagnosed for two days, resulting in a miscarriage and permanent heart damage. Baker also sued the professional corporations under which each doctor operated, which were formed under the Professional Corporation Act, NMSA 1978, Sections 53-6-1 to -14 (1963, as amended through 2001), claiming that the corporations were vicariously liable for the doctors' acts under the doctrine of respondeat superior.

**{4}**    In *Gordon*, Plaintiff Lorrice Gordon filed suit in the Second Judicial District Court, alleging that her doctor negligently performed an appendectomy that caused a small bowel obstruction for which she required additional surgery. She also sued the doctor's employer, ABQ Health Partners, LLC, a foreign limited liability company organized under the laws of Delaware, the doctrine of respondeat superior.

3

**{5}**    Finally, in *Campos*, Plaintiff Paul Campos, the personal representative of the estate of Cheri Wilson, filed suit in the First Judicial District Court against the doctor who had removed Wilson's gall bladder and her primary care physician, who provided follow-up care, for malpractice after they allegedly failed to diagnose a bile leak caused during the gall bladder surgery. Wilson subsequently died due to the undiagnosed bile leak. Each doctor practiced under a professional corporation formed under the Professional Corporation Act, and Campos also sued these corporations under the doctrine of respondeat superior.

**{6}**    Baker moved for summary judgment on her claim against defendant business entities, arguing that they could not benefit from the damages cap under the MMA because they did not meet the MMA's definition of "health care provider." The district court denied Baker's summary judgment motion and certified the issue of whether the defendant corporations were qualified health care providers for interlocutory appeal.

**{7}**    In *Gordon*, Defendant ABQ Health Partners, LLC filed a motion to dismiss or stay, arguing that it was a qualified health care provider covered by the MMA and Gordon failed to comply with the requirements of the MMA. The district court denied the motion and certified the case for interlocutory appeal on whether ABQ Health Partners, LLC qualified as a healthcare provider.

**{8}**    The district court in *Campos* found that the defendant corporations were qualified health care providers, but stayed the litigation in anticipation of an interlocutory appeal. Campos then applied for an interlocutory appeal on whether "the Legislature's decision not to include professional corporations as 'health care providers' in the MMA is given binding force in district courts across the State of New Mexico."

**{9}**    The Court of Appeals granted all three interlocutory appeals and consolidated them because they each raised a similar question. *Baker*, 2012-NMCA-073, ¶ 6. The Court ultimately concluded that the plain language of the definition of "health care provider" in Section 41-5-3(A) of the MMA literally excludes Defendants, but that adhering to the literal language of the definition "would conflict with the overall legislative purpose" and "would make little sense in light of the historical circumstances" leading to the enactment of the MMA and "the structure of the MMA itself." *Baker*, 2012-NMCA-073, ¶¶ 17-18. Consequently, the Court of Appeals held "that the Legislature intended to include Defendants in the definition of 'health care provider' and, thus, to allow them to qualify for coverage under the MMA." *Id.* ¶ 40. Plaintiffs then filed a petition for writ of certiorari, which we granted. While we agree with the Court of Appeals that the Legislature intended the MMA to cover qualified professional medical organizations like Defendants, we do so under a different approach.

## II.    DISCUSSION

### A.    Standard of Review and Rules of Statutory Construction

4

**{10}** Our task is to determine whether the Legislature intended Defendants to be eligible to qualify as "health care providers" under the MMA so as to receive the Act's benefits. *See* § 41-5-3(A) (defining "health care provider"); § 41-5-5(C) (explaining that health care providers that do not meet the qualifications under that "section shall not have the benefit of any of the provisions of the [MMA]"). Whether the Legislature intended professional medical organizations like Defendants to become qualified "health care providers" under the MMA presents an issue of statutory construction, which is a question of law that this Court reviews de novo. *See United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 7, 148 N.M. 426, 237 P.3d 728 ("The meaning of language used in a statute is a question of law that we review de novo." (internal quotation marks and citation omitted)).

**{11}** "When construing statutes, our guiding principle is to determine and give effect to legislative intent." *El Paso Elec. Co. v. N.M. Pub. Regulation Comm'n*, 2010-NMSC-048, ¶ 7, 149 N.M. 174, 246 P.3d 443 (internal quotation marks and citations omitted), *accord Jordan v. Allstate Ins. Co.*, 2010-NMSC-051, ¶ 15, 149 N.M. 162, 245 P.3d 1214 ("This Court's primary goal when interpreting statutes is to further legislative intent."). We "us[e] the plain language of the statute as the primary indicator of legislative intent[.]" *State v. Willie*, 2009-NMSC-037, ¶ 9, 146 N.M. 481, 212 P.3d 369 (second alteration in original) (internal quotation marks and citation omitted). However, "[i]f the plain meaning of the statute is doubtful, ambiguous, or [if] an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, we will construe the statute according to its obvious spirit or reason." *Id.* (second alteration in original) (internal quotation marks and citation omitted).

**B.    The Definition of "Health Care Provider" Includes Professional Medical Organizations As Expressed in the Purpose of the Act and the Language in the Act**

**{12}** Plaintiffs argue that the plain meaning of the definition of "health care provider" excludes Defendants. We first examine Plaintiffs' interpretation in the context of the Legislature's purpose for enacting the MMA and, like the Court of Appeals, conclude that their interpretation is irreconcilable with the Act's purpose. *See Baker*, 2012-NMCA-073, ¶ 29.

**{13}** However, we then diverge from the Court of Appeals' approach by disagreeing with Plaintiffs' argument that the definition of "health care provider," if interpreted literally, excludes Defendants. Although the language in the definition is ambiguous, our interpretation of this language supports our conclusion that the Legislature intended to cover professional medical organizations that qualify under the Act.

**1.    The Legislature's Stated Purpose for Enacting the MMA Supports Including Professional Medical Organizations as "Health Care Providers"**

**{14}** Plaintiffs ask this Court to conclude that the Legislature did not intend Defendants

to be covered by the Act because "the plain language of the definition of a 'health care provider'" expressly excludes Defendants. The MMA defines "health care provider" as "a person, corporation, organization, facility or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist or physician's assistant." Section 41-5-3(A). In Plaintiffs' view, the term "health care provider" only applies to "six categories of individuals 'licensed or certified to provide health care or professional services as a doctor of medicine . . . doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist [and] physician's assistant,' and two organizational entities similarly licensed as a 'hospital [or] outpatient facility.'" Plaintiffs argue that since "practice group business entities and professional corporations do not fit into any of those eight categories and were not specifically included by the Legislature in any other part of the MMA," they are not entitled to qualify as "health care providers" under the MMA.

{15}   We must examine Plaintiffs' interpretation in the context of the statute as a whole, including the purposes and consequences of the Act. *See N.M. Pharm. Ass'n v. State*, 1987-NMSC-054, ¶ 8, 106 N.M. 73, 738 P.2d 1318 ("In interpreting statutes, we should read the entire statute as a whole so that each provision may be considered in relation to every other part."). If Plaintiffs' interpretation leads to absurdities, or if it conflicts with the Legislature's purpose for enacting the MMA, then we cannot conclude that their interpretation reflects legislative intent. *See Rutherford v. Chaves Cnty.*, 2003-NMSC-010, ¶ 24, 133 N.M. 756, 69 P.3d 1199 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals."); *accord Eldridge v. Circle K Corp.*, 1997-NMCA-022, ¶ 29, 123 N.M. 145, 934 P.2d 1074 ("[O]ur task is not to apply language literally when it would lead to counterproductive, inconsistent, and absurd results; we must harmonize the statutory language to achieve the overall legislative purpose."). In examining the provisions of the MMA, we adhere to Justice Montgomery's wise words of caution in applying the plain meaning rule, acknowledging that ambiguity may be lurking in even seemingly plain words if they conflict with the overall legislative intent. "[The plain meaning rule's] beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may . . . give rise to legitimate . . . differences of opinion concerning the statute's meaning." *State ex. rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352.

{16}   Thus, we begin by considering the purpose of the MMA. The Legislature's stated purpose for enacting the MMA was "to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico." Section 41-5-2. "A major purpose of the Medical Malpractice Act was to meet a perceived insurance crisis" in New Mexico. *Wilschinsky v. Medina*, 1989-NMSC-047, ¶ 26, 108 N.M. 511, 775 P.2d 713. This  crisis

> was triggered by the announced withdrawal of the insurance company underwriting the medical society's professional liability program in which ninety  percent  of  medical  practitioners  and  health  care  institutions

6

participated. A result of this concern was the Medical Malpractice Act. . . . Availability of health care depends on providing incentives to persons to furnish health care services. If the practitioner must bear the cost of the patient's injury, there is a powerful disincentive to furnishing services at all. This disincentive may be met by making professional liability insurance available.

*Otero v. Zouhar*, 1984-NMCA-054, ¶ 15, 102 N.M. 493, 697 P.2d 493 (citing Ruth L. Kovnat, *Medical Malpractice Legislation in New Mexico*, 7 N.M. L. Rev. 5, 6, 7 n.6, 8 n.10 & n.11 (1976-77)), *reversed on appeal on other grounds by Grantland v. Lea Reg'l Hosp., Inc.*, 1985-NMSC-021, 102 N.M. 482, 697 P.2d 582.

**{17}** To give effect to the purpose of the MMA, the Legislature created a balanced scheme to encourage health care providers to opt into the Act by conferring certain benefits to them, which it then balanced with the benefits it provided to their patients. "[T]he Legislature made professional liability insurance available to health care providers but conditioned availability to that insurance on a quid pro quo: health care providers could receive the benefits of the MMA only if they became qualified health care providers under the MMA and accepted the burdens of doing so." *Christus St. Vincent Reg'l Med. Ctr. v. Duarte-Afara*, 2011-NMCA-112, ¶ 10, 267 P.3d 70. To be "qualified," health care providers must establish certain financial responsibilities with the superintendent of insurance, which include paying a surcharge into the patient's compensation fund and either filing proof of liability coverage with the superintendent of insurance or submitting a deposit to the superintendent to cover a maximum of three separate occurrences of malpractice. *See* § 41-5-5 (listing the qualifications requirements).

**{18}** In exchange, the Act limits the health care provider's liability to $200,000, and any judgments in excess of that amount are paid out of the patient's compensation fund. Section 41-5-6(D); § 41-5-25(G). The other benefits to qualified providers are a cap on damages ($600,000, excluding punitive damages and medical care costs in excess of that amount), Section 41-5-6(A) & (B); the prohibition of monetary awards for future medical expenses (they must be paid out as they accrue rather than in advance), Section 41-5-6(B) & (C) & Section 41-5-7(D); the requirement that plaintiffs submit malpractice claims to the medical review commission for permission to sue the provider in district court, Section 41-5-14(D); a rule that the demands for damages in complaints submitted to district court cannot specify a requested dollar amount (only "such damages as are reasonable"), Section 41-5-4; and a three-year statute of limitations, Section 41-5-13, *held unconstitutional on other grounds by Jaramillo v. Heaton*, 2004-NMCA-123, ¶ 19, 136 N.M. 498, 100 P.3d 204. These requirements benefit qualified health care providers by acting as a bar to claims initiated by patients who fail to comply with the Act's provisions. *See, e.g.*, *Belser v. O'Cleireachain*, 2005-NMCA-073, ¶ 1, 137 N.M. 623, 114 P.3d 303 (affirming the district court's dismissal with prejudice for the plaintiff's failure to file an application with the medical review commission, which had the effect of dismissing the plaintiff's case permanently because the three-year statute of limitations had run); *Rupp v. Hurley*, 2002-NMCA-023, ¶ 21, 131 N.M.

646, 41 P.3d 914 ("[T]he necessity for [a medical review commission] determination prior to the filing of a medical malpractice claim remains a mandatory procedural threshold that must be crossed in the ordinary case.").

**{19}** In exchange for the burdens placed on patients who receive medical care from qualified health care providers, the Act provides the following benefits to them: the ability to recover from the patient's compensation fund, Section 41-5-25(G); assurance that future medical costs will be covered, Section 41-5-7(B); assistance in retaining a medical expert, Section 41-5-23; and the ability to seek punitive damages outside of the MMA, Section 41-5-7(H) & Section 41-5-6(A).

**{20}** By providing benefits and imposing burdens, the Legislature created a system that inspires widespread participation to ensure that patients would have adequate access to health care services and that they would have a process through which they can recover for any malpractice claims. *See Cummings v. X-Ray Assocs. of N.M., P.C.*, 1996-NMSC-035, ¶¶ 29-30, 121 N.M. 821, 918 P.2d 1321 ("The legislature provided a number of incentives to assure participation by health care providers in the burdens of qualification under the Medical Malpractice Act. . . . [B]y offering to qualified health care providers certain benefits that are not available to those who are not qualified, the legislature furthers its stated goal of assuring adequate malpractice insurance coverage in the New Mexico medical profession."); *Moncor Trust Co. Ex rel. of Flynn v. Feil*, 1987-NMCA-015, ¶ 9, 105 N.M. 444, 733 P.2d 1327 ("An obvious goal of the legislature in enacting this legislation was to address certain factors adversely affecting the cost of medical malpractice insurance, to encourage continued availability of professional medical services, and to provide incentives for the furnishing of professional liability insurance.").

**{21}** In light of the Act's purpose, we can discern no reason why the Legislature would intend to cover individual medical professionals under the Act while excluding the business organizations that they operate under to provide health care. We agree with Defendants that "[t]here is nothing in the statute indicating that the legislature wanted to impair or eliminate the ability of physicians to practice under the umbrella of a professional entity." Were we to accept Plaintiffs' interpretation, we would be forcing individual providers to choose between either being fully protected by the MMA by operating as a sole proprietorship or limiting their exposure to other types of liability besides malpractice by practicing under the umbrella of a business entity. Defendants assert that "[t]here is simply no principled basis for forcing physicians to choose between having the protection of a corporate form and having the protection of the MMA." We agree. Forcing individual medical professionals to choose between two options that each leave them exposed to a certain level of personal liability acts as a disincentive to practice medicine at all, which is exactly what the Legislature was trying to address by incentivizing participation in the MMA. Thus, covering individuals without offering the same benefits to the companies that they form or operate under disturbs the balanced scheme originally set up by the Legislature that was intended to attract enough health care providers to service the needs of patients in New Mexico and, in turn, ensure that the patients were protected when claims for medical malpractice arise.

Plaintiffs' interpretation conflicts with both the Legislature's stated purpose and its goal to assure that providers of health care are adequately covered in New Mexico. "We will not construe a statute to defeat [its] intended purpose." *Padilla v. Montano*, 1993-NMCA-127, ¶ 23, 116 N.M. 398, 862 P.2d 1257. Therefore, we determine that the Legislature recognized that individual medical professionals may operate as a corporation or some other type of legal entity, and by doing so, the legal entity shall likewise be entitled to qualify under the Act.

2.      **The Definition of "Health Care Provider" Demonstrates that the Legislature Intended to Cover, Not Exclude, Professional Health Care Organizations**

**{22}**    Not only is Plaintiffs' plain meaning interpretation of the definition of "health care provider" incompatible with the purpose of the MMA, it also ignores a key term in the definition that renders the definition ambiguous. We resolve this ambiguity in Defendants' favor.

**{23}**    Plaintiffs argued to the Court of Appeals that "the plain meaning of Section 41-5-3(A) encompasses two distinct and discrete groups: persons licensed as (1) doctors, (2) doctors of osteopathy, (3) chiropractors, (4) podiatrists, (5) nurse anesthetists, and (6) physician assistants *and* corporations, organizations, facilities, or institutions licensed or certified as (1) hospitals or (2) outpatient health care facilities." *Baker*, 2012-NMCA-073, ¶ 13. The Court of Appeals accepted Plaintiffs' phrasing of the definition in its plain meaning analysis when it concluded that Defendants offered no "compelling alternative reading" and that if it were to "look only at the literal language in [the definition of 'health care provider'] and nothing else, [it] would agree with Plaintiffs' interpretation of [the definition] and further that Defendants do not fall within the definition of that term." *Id.* ¶¶ 16-17. We disagree with Plaintiffs and the Court of Appeals that the definition of "health care provider" plainly and literally excludes Defendants.

**{24}**    Plaintiffs' interpretation of the definition conspicuously omits any discussion of the term "professional services." *See* § 41-5-3(A) ("'[H]ealth care provider' means a person, corporation, organization, facility or institution licensed or certified by this state to provide health care *or professional services . . . .*" (emphasis added)). Plaintiffs offer no explanation for the Legislature's inclusion of this term. Yet, "the legislature is presumed not to have used any surplus words in a statute; each word is to be given meaning." *Helman*, 1994-NMSC-023, ¶ 32. This Court must interpret a statute so as to avoid rendering the Legislature's language superfluous. *Katz v. N.M. Dep't of Human Servs., Income Support Div.*, 1981-NMSC-012, ¶ 18, 95 N.M. 530, 624 P.2d 39; *see also Diamond v. Diamond*, 2012-NMSC-022, ¶ 29, 283 P.3d 260 ("We must assume the [L]egislature chose its words advisedly to express its meaning unless the contrary intent clearly appears." (internal quotation marks and citations omitted)). Therefore, we must consider what the Legislature intended by including the term "professional services" in the definition of "health care provider."

**{25}**    Since the MMA does not define the term "professional services," we first explore

whether it has an ordinary meaning in the context of the definition of "health care provider." *State v. Tsosie*, 2011-NMCA-115, ¶ 19, 150 N.M. 754, 266 P.3d 34 ("'When a term is not defined in a statute, we must construe it, giving those words their ordinary meaning absent clear and express legislative intention to the contrary.'" (quoting *State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863)). We conclude that the term "professional services" has no clear ordinary meaning that reveals a difference in the Legislature's view between health care providers licensed to provide *health care* as doctors of medicine, doctors of osteopathy, chiropractors, podiatrists, nurse anesthetists, or physician's assistants versus those licensed or certified to provide *professional services* doctors of medicine, doctors of osteopathy, chiropractors, podiatrists, nurse anesthetists, or physician's assistants.

**{26}** However, previous legislation provides guidance in determining the Legislature's purpose for including the term "professional services." We accept Defendants' invitation to examine the definition of "professional services" in the Professional Corporation Act, which dictates when corporations can provide services that its individual members must be licensed or otherwise legally authorized to provide. *See* § 53-6-1. "[W]e apply the fundamental rule of statutory construction . . . that all provisions of a statute, together with other statutes in pari materia, must be read together to ascertain the legislative intent." *N.M. Bd. of Veterinary Med. v. Riegger*, 2007-NMSC-044, ¶ 13, 142 N.M. 248, 164 P.3d 947 (alterations in original) (internal quotation marks and citations omitted); *see also State ex rel. Quintana v. Schnedar*, 1993-NMSC-033, ¶ 4, 115 N.M. 573, 855 P.2d 562 ("In ascertaining legislative intent, the provisions of a statute must be read together with other statutes *in pari materia* under the presumption that the legislature acted with full knowledge of relevant statutory and common law.").

**{27}** The Professional Corporation Act defines "professional service[s]" as:

> [A]ny type of personal service to the public which requires, as a condition precedent to the rendering of such service, the obtaining of a license or other legal authorization and which, prior to the passage of the Professional Corporation Act and by reason of law, could not be performed by a corporation. The term includes, but is not necessarily limited to, the personal services rendered by certified public accountants, registered public accountants, *chiropractors*, optometrists, dentists, *osteopaths*, *podiatrists*, architects, veterinarians, *doctors of medicine*, doctors of dentistry, *physicians and surgeons*, attorneys-at-law and life insurance agents.

Section 53-6-3(A) (emphasis added) (citation omitted). The Professional Corporation Act further defines a "professional corporation" as "a corporation which is organized under the Professional Corporation Act for the sole and specific purpose of rendering professional service and which has as its shareholders only individuals who themselves are licensed or otherwise legally authorized within this state to render the same professional service as the corporation." Section 53-6-3(B).

10

**{28}**     Defendants assert that the Legislature's inclusion of "professional services" in the MMA's definition of "health care provider" indicates an attitude favorable toward incorporation by professionals, including medical professionals. We agree. The Legislature enacted the Professional Corporation Act in 1963–thirteen years before it enacted the MMA. Since we presume that the Legislature was aware of its own prior enactments, we must presume that its use of the Professional Corporation Act's term was purposeful. *See Citation Bingo, Ltd. v. Otten*, 1996-NMSC-003, ¶ 21, 121 N.M. 205, 910 P.2d 271 ("[W]e presume that the legislature was aware of existing statutory and common law and did not intend to enact a law inconsistent with existing law."). The Professional Corporation Act's definition of "professional services" clarifies the difference between providers providing "health care" and providers providing "professional services." It is *businesses*, rather than individuals, that provide professional services, which are services that must be provided by licensed individuals. Thus, we determine that the Legislature included the phrase "or professional services" to indicate that health care providers include not only individuals and hospital or outpatient facilities licensed to provide health care, but also corporations and organizations providing the professional services listed in the definition of "health care provider."

**{29}**     Plaintiffs argue that if the Legislature had intended to cover professional corporations incorporated under the Professional Corporation Act, it would have explicitly mentioned that corporate business entities were covered. However, if the Legislature had explicitly mentioned the Professional Corporation Act or "corporate business entities," it would have included only professional corporations, to the exclusion of various other types of legal organizations under which medical professionals may choose to operate. The Legislature's inclusion of the term "organization" in addition to "corporation" in the statute indicates that it did not intend the definition to be so limiting. *See* § 41-5-3(A). Rather, it recognized that medical professionals may choose to offer professional services through other types of business entities besides professional corporations. Thus, we conclude that the Legislature's inclusion of the broad terms "corporation" and "organization," rather than listing specific types of legal entities, was purposeful. This reflected the Legislature's intent that the MMA cover the many other kinds of legal organizations that employ medical professionals offering the kinds of health care services listed in Section 41-5-3(A) that professional corporations can provide.

**{30}**     Plaintiffs further argue that the Legislature could not have intended to cover business entities because business entities cannot be licensed by the State to provide health care or professional services *as* doctors of medicine, doctors of osteopathy, chiropractors, podiatrists, nurse anesthetists, or physician's assistants. Plaintiffs are correct that there is no state mechanism by which professional organizations such as Defendants are licensed or certified to provide such health care. However, we reject Plaintiffs' conclusion that because of this, Defendants would not be eligible to qualify as "health care providers" under the Act. We refuse to parse the Legislature's words in such a literal and mechanical manner. *See Cummings*, 1996-NMSC-035, ¶ 45 ("[The plain meaning] rule does not require a mechanical, literal interpretation of the statutory language."). "We will not rest our conclusions upon the plain meaning of the language if the intention of the legislature

11

suggests a meaning different from that suggested by the literal language of the law." *Id.* Plaintiffs' interpretation disregards the effect of the Legislature's inclusion of the term "professional services" in the Act. We determine that the Legislature was simply imprecise with its language. The Legislature would not have contemplated covering health care providers rendering "professional services" like those listed in Section 41-5-3(A) *and* required that the providers be licensed or certified by the State to perform those services, yet afford no process or procedure for them to *become* licensed or certified. "If the strict wording of the law suggests an absurd result, we may interpret the statute to avoid such a result." *Cummings*, 1996-NMSC-035, ¶ 45.

**{31}** Rather, we conclude that it is the licensure or certification of the *individual* that must be of concern to the Legislature. Indeed, any procedure to license or certify the corporation or organization to provide professional services would be redundant since, under the doctrine of respondeat superior, the legal organization as the passive tortfeasor is only liable to the extent of the legal liability of the individual medical professional who is the active tortfeasor. *See Harrison v. Lucero*, 1974-NMCA-085, ¶ 12, 86 N.M. 581, 525 P.2d 941, ("[T]he exoneration of the servant removes the foundation upon which to impute negligence to the master." (internal quotation marks and citation omitted)), *holding modified on other grounds by Vidal v. Am. Gen. Cos.*, 1990-NMSC-003, ¶ 14, 109 N.M. 320, 785 P.2d 231. Since the MMA only covers the acts of medical malpractice committed by an individual who must be licensed or certified as a doctor of medicine, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist, or physician's assistant, any claim for malpractice brought against a legal organization can only be brought under the doctrine of respondeat superior for the alleged malpractice of the licensed or certified medical professional listed in Section 41-5-3(A). For this reason, we hold that professional corporations or other types of professional medical organizations under which a medical professional operates are eligible to become qualified health care providers under the MMA as long as they employ or consist of members who are licensed or certified by the State as doctors of medicine, doctors of osteopathy, chiropractors, podiatrists, nurse anesthetists, or physician's assistants.

## C. The Legislature Intended the MMA to Cover Professional Medical Organizations Sued Under the Doctrine of Respondeat Superior

**{32}** All of the defendant professional medical organizations in these cases were sued for vicarious liability of their employees under the doctrine of respondeat superior. *See* Restatement (Third) of Agency: Respondeat Superior § 2.04 (2006) ("An employer is subject to liability for torts committed by employees while acting within the scope of their employment."). When individual professionals operate under the umbrella of a legal business entity, they also become employees of that entity. *See* Restatement (Third) of Torts: Apportionment of Liability § 7 cmt. j (2000) (explaining that the employer and the employee are treated as one entity for purposes of assigning liability). Because corporations act through their employees, corporations may be held vicariously liable for the negligence of their employees who injure someone while in the course and scope of their employment. *See* Restatement (Third) of Agency § 2.04.

**{33}** Plaintiffs' argue that the MMA covers individuals but excludes the professional medical organizations for which they are employed. Although these covered individuals may be sued for acts of malpractice, the fact that the professional medical organizations are not covered by the Act leads to absurd results that the Legislature could not have intended and also conflicts with the doctrine of respondeat superior language as it is used in the MMA.

**1.    The Definition of "Health Care Provider" Must Be Interpreted So As to Avoid Absurd Results**

**{34}** The MMA only covers claims for medical malpractice. *See* § 41-5-3(C) (defining "malpractice claim" as "any cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient, whether the patient's claim or cause of action sounds in tort or contract, and includes but is not limited to actions based on battery or wrongful death"); § 41-5-4 (explaining when a patient or his representative may file a malpractice claim under the Act); *see, e.g.*, *Trujillo v. Puro*, 1984-NMCA-050, ¶ 9, 101 N.M. 408, 683 P.2d 963 (concluding that negligent misrepresentation and negligent infliction of emotional distress are not covered under the MMA because they are not medical malpractice claims). Thus, medical professionals like the doctors in these consolidated cases often choose to form or operate as professional corporations, limited liability companies, or any other legal form of business organization in order to limit their exposure to other types of liability besides medical malpractice claims. For example, medical professionals may opt to operate under the umbrella of such corporations or organizations in order to limit their individual liability for the torts of their employees under the doctrine of respondeat superior.

**{35}** Under Plaintiffs' interpretation of the Act, the Legislature intended these individual medical professional to be eligible to opt into the MMA, but it did not intend the business organizations that they formed to be eligible. This interpretation leads to absurd results. If a doctor who has formed a limited liability company for the reasons described above commits medical malpractice, the injured patient can sue: (1) the doctor in his or her individual capacity, (2) the legal organization formed by the doctor as his or her employer, or (3) both. If the MMA only covered a doctor in his or her individual capacity, but not the doctor's legal business organization, under the doctrine of respondeat superior, the patient could simply circumvent the provisions that the Legislature intended to benefit the individual doctor by directly suing the doctor's company for malpractice in district court. Defendants argue that this "end run around the MMA" effectively divests individual medical professionals from the Act's protection. We agree.

**{36}** One of the doctors in the consolidated cases before us operates under a professional corporation that she formed and of which she is the sole member. There is no dispute that she may qualify as a health care provider under the Act, in her individual capacity. Plaintiffs, however, argue that her corporation cannot qualify as a health care provider–even though it is also being sued vicariously for *her* alleged malpractice. Under Plaintiffs' theory, the

13

doctor's patients can sue her corporation in district court for the same alleged malpractice for which she is covered by the MMA. Plaintiffs can sue the corporation without complying with any of the provisions of the Act, and the doctor would not receive any benefits to which she is entitled in her individual capacity. The Legislature could not have intended to strip individual medical professionals of the MMA's protections simply because they choose to operate as a business corporation, professional corporation, limited liability corporation, or any other legal form of business organization. *See State v. Padilla*, 2006-NMCA-107, ¶ 11, 140 N.M. 333, 142 P.3d 921 ("We avoid any construction that would be 'absurd, unreasonable, or contrary to the spirit of the statute.'" (quoting *State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022)), *reversed on other grounds by State v. Padilla*, 2008-NMSC-006, ¶ 34, 143 N.M. 310, 176 P.3d 299; *accord Padilla v. Montano*, 1993-NMCA-127, ¶ 23 ("Legislative enactments are to be interpreted to accord with common sense and reason. We will not construe a statute to defeat the intended purpose or achieve an absurd result." (citation omitted)). Provided that medical business organizations meet all of the conditions to qualify as health care providers, we can discern no reason why the Legislature would have excluded them from the protections of the Act.

**2.** **The Doctrine of Respondeat Superior Provisions in the MMA Reflect the Legislature's Intent to Cover Professional Medical Organizations like Defendants Who Are Sued Under that Doctrine**

**{37}** The language in the Act provides further support that the Legislature intended to cover professional medical organizations being sued under the doctrine of respondeat superior. The MMA recognizes that a claim may be brought against a health care provider under the doctrine of respondeat superior in Section 41-5-16(C), which provides:

> In instances where applications are received employing the theory of respondeat superior or some other derivative theory of recovery, the director shall forward such applications to the state professional societies, associations or licensing boards of both the individual health care provider whose alleged malpractice caused the application to be filed, and the health care provider named a respondent as employer, master or principal.

**{38}** Also, the selection of the panel that hears the merits of a malpractice claim before the medical review commission is different when the doctrine of respondeat superior is implicated. *See* § 41-5-17(E) ("In those cases where the theory of respondeat superior . . . is employed, two of the panel members shall be chosen from the individual health care provider's profession and one panel member shall be chosen from the *profession* of the health care provider named a respondent employer, master or principal." (emphasis added)).

**{39}** These provisions lend support to the interpretation that the Legislature intended that medical malpractice claims made against the employer under the doctrine of respondeat superior be brought under the Act. Plaintiffs' argument that none of the provisions in the Act apply to Defendants leads us to conclude that, in Plaintiffs' view, the doctrine of respondeat

14

superior provisions in the Act only apply to hospitals and outpatient facilities as employers. However, the language utilized by the Legislature demonstrates that it did not intend the application of these provisions to be so limited. The Legislature could have specifically mentioned hospitals and outpatient facilities when it referred to the third panel member in Section 41-5-17(E), just as it did in Section 41-5-5(B), which specifically references the different qualifications for hospitals and outpatient facilities. Instead, it used the much broader term "profession" of the health care provider-employer in Section 41-5-17(E). We therefore conclude that the Legislature intended that the provisions in the Act addressing medical malpractice claims brought under the doctrine of respondeat superior apply not only to hospitals and outpatient facilities but also to the professional medical organizations that also employ the types of providers listed in Section 41-5-3(A) and may be sued by patients under the doctrine of respondeat superior.

## III. CONCLUSION

**{40}** We hold that legal organizations offering the professional medical services listed in Section 41-5-3(A) are eligible to qualify as "health care providers" under the Act and thus are entitled to the MMA's benefits when they are sued for medical malpractice. We therefore affirm the Court of Appeals' order to reverse the district court's denial of Defendant's motion to dismiss in *Gordon* and affirm the orders of the district courts in *Baker* and *Campos*.

**{41}  IT IS SO ORDERED**.

_____
**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CYNTHIA A. FRY, Judge**
**Sitting by designation**

15