The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: June 8, 2026

**NO. S-1-SC-40580**

**KATHERINE FERLIC, as the Personal Representative of the Estate of PAMELA SMITH, deceased,**

Plaintiff-Respondent,

v.

**LOVELACE HEALTH SYSTEM, LLC, a New Mexico limited liability company, d/b/a Lovelace Medical Center, d/b/a Lovelace Medical Group,**

Defendant-Petitioner,

and

**AHS MANAGEMENT COMPANY, INC., a Tennessee corporation,**

Defendant.

**ORIGINAL PROCEEDING ON CERTIORARI
Kathleen McGarry Ellenwood, District Judge**

Holland & Hart LLP
Larry J. Montaño
Santa Fe, NM

Rodey, Dickason, Sloan, Akin & Robb
Paul R. Koller
Albuquerque, NM

for Petitioner

McGinn, Montoya, Love, Curry, & Sievers, PA
Kathleen J. Love
Katie Curry
Albuquerque, NM

for Respondent

Sutin, Thayer & Browne APC
Deborah E. Mann
Albuquerque, NM

for Amicus Curiae New Mexico Hospital Association

Martinez, Hart, Sanchez & Romero, PC
Julio C. Romero
Albuquerque, NM

Vigil Law Firm, PA
Alexandra Cervantes
Albuquerque, NM

New Mexico Trial Lawyers Association
David J. Stout
Albuquerque, NM

for Amicus Curiae New Mexico Trial Lawyers Association

**OPINION**

**THOMSON, Justice.**

{1}     When the Legislature enacted the New Mexico Medical Malpractice Act (the MMA or the Act) in 1976, it sought to create a balanced system of benefits and burdens for health care providers and patients alike, all with the goal of ensuring the availability of quality providers in New Mexico. *See* NMSA 1978, §§ 41-5-1 to -29 (1976, as amended through 2026);[1] § 41-5-2 (1976) (repealed 2021, effective Jan. 1, 2022) (stating the Act's purpose, "to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico"); *Baker v. Hedstrom*, 2013-NMSC-043, ¶¶ 17-21, 309 P.3d 1047. One statutorily created benefit is the promise of a damages cap in malpractice claims levied against health care providers who have taken the steps to become qualified health care providers (QHPs). Section 41-5-5 (1992) (setting out the requirements to be a QHP under the MMA); Section 41-5-6(A)-(B) (1992) ("Except for punitive damages and medical care and related benefits, the aggregate

---

[1]In 2021, the Legislature made numerous amendments to the MMA; several of those amendments took effect in mid-2021. *See* § 41-5-14. Those amendments became effective either in July 2021 or in 2022 and do not apply to this case, which arose from events occurring in March of 2021. Accordingly, all references to the MMA in this opinion refer to enactments or amendments made prior to the 2021 amendments of the MMA.

dollar amount recoverable by all persons for or arising from any injury or death to a patient as a result of malpractice shall not exceed five hundred thousand dollars ($500,000) per occurrence.").

{2}     Pamela A. Smith died in the care of Lovelace Health System, LLC (Lovelace) on April 18, 2021 after undergoing surgery on March 29, 2021 at Lovelace Medical Center in Albuquerque, New Mexico. The wrongful death Estate of Pamela Smith (Plaintiff) filed both direct negligence claims against Lovelace and vicarious liability claims against Lovelace based on the conduct of its employed registered nurses in caring for Ms. Smith. Lovelace was a QHP under the MMA; its employed registered nurses were not, nor were they eligible for qualification under the version of the Act in effect. *See* § 41-5-3(A) (1977); § 41-5-5 (1992). In this opinion we determine whether a QHP enjoys the benefits of the MMA in vicarious liability claims based on the conduct of its non-QHP employed registered nurses.[2]

{3}     Lovelace presents two questions in this appeal: (1) does Lovelace enjoy the benefits of the MMA in vicarious liability actions for the conduct of its employed registered nurses; and (2) are providers whose practice is not enumerated as eligible

---

[2]The remaining citations to Section 41-5-3 and one citation to Section 41-5-5 in this opinion omit the applicable date parentheticals: (1977) and (1992) respectively.

to become a QHP under the MMA, but whose employer is a QHP hospital, entitled to the MMA's benefits?

{4}     We hold that the plain language of the MMA demonstrates that the Act covers vicarious liability claims against QHPs based on the acts of a nurse employee who commits malpractice under the Act. *See* § 41-5-3(C) (defining malpractice claim under the MMA). Because our holding resolves the issue of the MMA's applicability to Lovelace with respect to the pending vicarious liability claims against it, and because the second question goes to the rights of individuals not a party to this case, we decline to address the second question raised.

{5}     We recognize that the parties raised a host of arguments regarding how the Legislature's 2021 amendments to the MMA ought to shape our interpretation of the provisions at issue here—all originally enacted in 1976 or 1992. We will not attempt to divine Legislative intent from amendments passed decades after the Legislature originally drafted, debated, and enacted the pertinent provisions of the MMA, particularly where the Act's plain language resolves the issue before us.

## I.     BACKGROUND AND PROCEDURAL HISTORY

{6}     At the time of Ms. Smith's death, the MMA did not list registered nurses in the definition of "health care provider." Section 41-5-3(A). Accordingly, Plaintiff sought summary judgment on the MMA's applicability to the claims arising from

Lovelace's employed registered nurses' conduct. Plaintiff argued that the plain language of the MMA precludes nurses from becoming QHPs, and, therefore, the MMA does not apply to vicarious liability claims rooted in their conduct. The district court agreed and granted summary judgment, concluding that "[r]egistered nurses are not categorically qualified to be qualified healthcare providers under the Medical Malpractice Act" and, therefore, Lovelace "is not entitled to the benefit and protections of the Medical Malpractice Act with respect to the conduct of its nurse employees." Lovelace sought certification for interlocutory appeal of the district court's conclusion, which the district court granted. The Court of Appeals denied interlocutory review; this Court then granted certiorari. Order Denying Application for Interlocutory Appeal, *Ferlic v. Lovelace Health Sys., LLC*, A-1-CA-41966 (N.M. Ct. App. Aug. 26, 2024); Writ of Certiorari, *Ferlic v. Lovelace Health Sys., LLC*, S-1-SC-40580 (N.M. Nov. 20, 2024).

**II. DISCUSSION**

**A. Standard of Review**

{7} "This Court's review of orders granting or denying summary judgment is de novo." *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 9, 335 P.3d 1243. We also review de novo the statutory construction question of whether Lovelace enjoys the benefits of the MMA in vicarious liability cases arising from the conduct of its non-

QHP employed registered nurses. *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 7, 148 N.M. 426, 237 P.3d 728 ("The meaning of language used in a statute is a question of law that we review de novo." (internal quotation marks and citation omitted)).

**B.    The Plain Language of the MMA Supports Applying the Damages Cap to the Vicarious Liability Actions Against Lovelace**

{8}    Addressing whether Lovelace enjoys the benefits of the MMA in vicarious liability claims based on the conduct of its non-QHP nurse employees requires the Court to engage in statutory construction to give effect to the Legislature's intent in its enactment of the MMA. *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350 ("In interpreting statutes, we seek to give effect to the Legislature's intent, and in determining intent we look to the language used and consider the statute's history and background."). "The first and most obvious guide to statutory interpretation is the wording of the statutes themselves." *Dewitt v. Rent-a-Center, Inc.*, 2009-NMSC-032, ¶ 29, 146 N.M. 453, 212 P.3d 341. We "will not depart from the plain language of the statute unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or . . . deal with an irreconcilable conflict among statutory provisions." *Maestas v. Zager*, 2007-NMSC-003, ¶ 9, 141 N.M. 154, 152 P.3d 141 (internal quotation marks and citation omitted).

{9} The MMA expressly limits the benefits of its provisions to health care providers qualified under the Act. Section 41-5-5(C) ("A health care provider not qualifying under this section shall not have the benefit of any of the provisions of the Medical Malpractice Act in the event of a malpractice claim against it."); *see also Roberts v. Sw. Cmty. Health Servs.*, 1992-NMSC-042, ¶ 17, 114 N.M. 248, 837 P.2d 442 (discussing the meaningful distinction between QHPs and non-QHPs under the MMA). The MMA defines "health care provider" as "a person, corporation, organization, facility or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist or physician's assistant." Section 41-5-3(A). The parties do not dispute that, per that definition, registered nurses cannot themselves be QHPs under the Act.

{10} Instead, Lovelace turns to the MMA's definition of a "malpractice claim" to argue that it, as a QHP, is entitled to the Act's protections in vicarious liability claims,[3] even those arising from the conduct of its non-QHP registered nurses. A "malpractice claim" is defined in the Act as

---

[3]As the Court explained in *Trujillo v. Presbyterian Healthcare Servs., Inc.*,

Vicarious liability is a common-law theory of liability rooted in agency through which a principal may be held liable for their agent's tortious conduct. *See Monett v. Dona Ana Cnty. Sheriff's Posse*, 1992-NMCA-

any cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient, whether the patient's claim or cause of action sounds in tort or contract, and includes but is not limited to actions based on battery or wrongful death.

Section 41-5-3(C).

{11} We agree with Lovelace that the plain language of Section 41-5-3(C) is quite broad in its definition of malpractice claims covered under the Act and encompasses vicarious liability claims where the agent's actions fall within the scope of that definition. While vicarious liability is a form of derivative liability rooted in the actions of an agent, who might not be a QHP, if the agent's actions constitute the

096, ¶ 10, 114 N.M. 452, 840 P.2d 599 ("Under the doctrine of respondeat superior, the master is liable for the negligent acts of the servant when committed during the course and scope of the servant's employment or agency."); *see also Baer v. Regents of Univ. of Cal.*, 1994-NMCA-124, ¶ 18, 118 N.M. 685, 884 P.2d 841 ("The law in New Mexico is well settled that, under the doctrine of respondeat superior, an employer can be held vicariously liable for the negligent acts of an employee when committed during the course and scope of the employee's employment."). There are multiple avenues for establishing vicarious liability, but all routes (1) depend on an agency relationship between the principal and the tortfeasor and (2) impute liability to the principal for the agent's tortious conduct. *See Spurlock v. Townes*, 2016-NMSC-014, ¶ 14, 368 P.3d 1213 (comparing traditional principles of respondeat superior with an aided-in-agency theory for establishing vicarious liability).

2025-NMSC-017, ¶ 12, 572 P.3d 935.

kinds of malfeasance covered under Section 41-5-3(C) *and* the claim is brought against a principal that is a QHP, the QHP principal is entitled to the MMA's protections. *See* § 41-5-3(C). Thus, on their face, Plaintiff's vicarious liability claims against Lovelace fall within the definition of a "malpractice claim" for which Lovelace is entitled to the MMA's protections. *Id.*

**C.    This Court's Holding in *Baker* Does Not Change Our Plain-Language Interpretation**

{12}    In efforts to avoid the Act's plain language, Plaintiff relies on this Court's opinion in *Baker*, 2013-NMSC-043, ¶¶ 30-31. In *Baker*, QHP-medical doctors created and practiced under non-QHP professional corporations. *Id.* The plaintiffs sued the non-QHP professional corporation for the actions of the QHP-medical doctors under theories of vicarious liability. *Id.* ¶¶ 30-31. The *Baker* plaintiffs argued that because professional corporations were not, themselves, listed in the MMA as "health care providers" and could not be licensed and certified as such, the MMA did not apply. *Id.* ¶¶ 30-31.

{13}    The *Baker* Court concluded, however, that the Legislature could not have intended to create a system that effectively deprives QHP physicians of the benefits of the MMA simply because they formed business entities through which to practice. *Id.* ¶¶ 32, 34-36. In the narrow context of respondeat superior claims based on the conduct of a QHP physician, we reasoned,

[I]t is the licensure or certification of the *individual* that must be of concern to the Legislature. Indeed, any procedure to license or certify the corporation or organization to provide professional services would be redundant since, under the doctrine of respondeat superior, the legal organization as the passive tortfeasor is only liable to the extent of the legal liability of the individual medical professional who is the active tortfeasor. . . . Since the MMA only covers the acts of medical malpractice committed by an individual who must be licensed or certified as a doctor of medicine, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist, or physician's assistant, any claim for malpractice brought against a legal organization can only be brought under the doctrine of respondeat superior for the alleged malpractice of the licensed or certified medical professional listed in Section 41-5-3(A).

*Id.* ¶ 31 (citation omitted).

{14} Despite the particular circumstances giving rise to the Court's analysis in *Baker*, Plaintiff relies on the language quoted above to support her theory as to why the MMA does not apply to the vicarious liability claims against Lovelace despite its QHP status. First, Plaintiff argues that because nurses cannot be QHPs, respondeat superior claims against hospitals for the conduct of nurses do not meet the definition of a "malpractice claim" under the MMA. *See* Section 41-5-3(C). Second, Plaintiff asserts that *Baker* establishes a rule that it is the QHP status of the *tortious actor* that controls whether the MMA applies in vicarious liability, not the QHP status of the principal. These arguments take *Baker* out of context and contradict both the language of the Act and legislative intent.

**1. The MMA does not require that a "malpractice claim" arise exclusively from the conduct of a "health care provider" as defined in the Act**

{15}   First, Plaintiff argues *Baker* mandates that in order for a claim to be a "malpractice claim" under the MMA, it must be based on the actions of a QHP. Otherwise stated, because registered nurses are not "health care provider[s]" and therefore cannot be QHPs under the Act, malpractice claims cannot be based on their conduct. *See* § 41-5-3(A), (C). This limitation suggested by Plaintiff is simply not supported by the language of the statute. Although it is clear under Section 41-5-3(C) that malpractice claims must be brought *against* a QHP, nothing in the language of the statute indicates that *only* those providers enumerated under Section 41-5-3(A) can commit malpractice cognizable under the MMA. *See* § 41-5-3(C) (defining "malpractice claim" as "any cause of action arising in this state *against a health care provider* for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient" (emphasis added)).

{16}   Instead, Plaintiff relies on the *Baker* Court's statement that "the MMA *only* covers the acts of medical malpractice committed by an individual who must be licensed or certified as a doctor of medicine, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist, or physician's assistant" to assert that registered nurses cannot commit malpractice under the MMA. 2013-NMSC-043, ¶ 31 (emphasis

added). Our statement in *Baker* is not accompanied by any analysis of the definition of "malpractice claim," and there is no cited source for that proposition. *See id.*

{17}     Plaintiff's interpretation of *Baker* neither comports with nor overcomes the plain language of Section 41-5-3(C). The *Baker* Court's reasoning, as captured in this cited statement, is quite simple and reasonable, and it aligns with core principles of vicarious liability. That is, the professional corporations in *Baker* could not act except through the conduct of the QHP physicians that formed the corporations. Therefore, under the circumstances, it was true that the claimed malpractice in that case could only have been committed by the QHPs, who were subject to the MMA's protections. *See Baker*, 2013-NMSC-014, ¶ 31 (observing that "the legal organization as the passive tortfeasor is only liable to the extent of the legal liability of the individual medical professional who is the active tortfeasor"). And ultimately, the Court concluded that it was unjust and discordant with legislative intent to strip the QHP physicians of the Act's benefits by allowing the plaintiffs to sidestep MMA applicability by suing the professional corporations only. *Id.*

{18}     It is true that, under Section 41-5-3(C) of the Act, only QHPs are *protected* by the MMA for malpractice claims against them. That does not necessarily mean that only QHPs, or those eligible to become QHPs, can commit malpractice that is cognizable under that section of the statute. The definition of "malpractice claim"

only requires "medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient." Section 41-5-3(C).

{19}     When assessing whether a particular act constituted malpractice, as opposed to ordinary negligence, the Court of Appeals has looked to the "functional test." *See Richter v. Presbyterian Healthcare Servs.*, 2014-NMCA-056, ¶ 22, 326 P.3d 50. That is, whether "the act involves the use of specialized knowledge or skill to make a judgment call as to the appropriate thing to do or not do." *Id.* We conclude that this test is the appropriate standard to apply in this case when assessing whether the registered nursing conduct at issue falls within the scope of Section 41-5-3(C).

{20}     The only sections of the Act that expressly address respondeat superior claims as malpractice claims do so in the context of the medical review commission's role in reviewing claims under the Act. *See* § 41-5-14 (1976), § 41-5-16 (1976),[4] and § 41-5-17 (1976). Plaintiff argues that these provisions demonstrate that the "Legislature clearly knew how to account for vicarious liability but did not extend the MMA's protections to malpractice claims against non-qualified provider employees for whom a qualified provider hospital could be vicariously liable."

_____

[4]The remaining citations of Section 41-5-14 and citation of Section 41-5-16 omit the applicable (1976) date parenthetical.

{21} Nothing in these provisions alters our conclusion. Section 41-5-14 establishes the medical review commission and puts guardrails on the kinds of cases it reviews. It provides that "[t]he function of the New Mexico medical review commission is to provide panels to review all malpractice claims *against* the health care providers covered by the Medical Malpractice Act," as well as "cases involving any alleged act of malpractice occurring in New Mexico *by* health care providers qualified under the Medical Malpractice Act." Section 41-5-14(A), (C) (emphasis added). Similarly, Sections 41-5-16 to -17 outline procedures for commission review. Read within the context of the MMA as a whole, these sections plainly do not foreclose the possibility that malpractice might be committed by a non-health care provider, nor do they inform the Court's view of the scope of vicarious liability or "malpractice claim[s]" contemplated under the MMA more broadly. Section 41-5-3(C).

**2.    Here, the QHP status of Lovelace controls MMA applicability to the vicarious liability claims**

{22} Plaintiff advances a second argument on the limits of the MMA's protections in vicarious liability cases. Plaintiff relies on this Court's statement in *Baker* that "it is the licensure or certification of the *individual* that must be of concern to the Legislature" to argue that it is the QHP status of the tortious actor that controls whether the MMA applies in vicarious liability, not the QHP status of the principal. 2013-NMSC-043, ¶ 31. Lovelace argues, and we agree, that this assertion was

context-specific and does not require the Court to hold that the QHP status of the agent controls MMA applicability in vicarious liability claims.

{23} As explained, in *Baker*, the Court was analyzing whether the Legislature intended to include professional corporations within the MMA's protections. *Id.* ¶¶ 30-31. The plaintiffs argued, in part, that because such entities cannot be "licensed or certified by this state to provide health care or professional services," they cannot be "health care providers," eligible for qualification under the Act. *Id.* ¶¶ 14, 30-31 (internal quotation marks and citation omitted). Therefore, the Legislature must have intended to exclude them from the MMA's benefits. *Id.* ¶¶ 30-31. The *Baker* Court rejected that argument and ultimately concluded that where a business entity employs or consists of members who are QHPs, the entity itself is eligible to become a QHP. *Id.* ¶ 31. This was because denying the MMA's protections to QHP physicians merely because they form professional corporations would eviscerate the MMA's protections and purpose and ultimately would make no sense under principles of respondeat superior, where the liability of the principal cannot exceed that of the agent. *Id.* Simply put, the Legislature could not have intended to limit the MMA's application where the conduct of a QHP physician is at issue simply because the claims were brought against a professional corporation ineligible for qualification under the Act. *Id.* Therefore, it made sense, in that context, for the

question of whether the MMA applied to rest with the status of the health care professional providing services. Ultimately, construing the MMA so as to not arbitrarily deprive QHPs of the MMA's benefits drove the Court's analysis and holding.

{24} Here, Plaintiff attempts to leverage one line from *Baker* to achieve the very end that the *Baker* Court rejected; Plaintiff seeks to circumvent Lovelace's QHP status by basing her claims on the conduct of employed registered nurses—who cannot be QHPs under the Act. Plaintiff reasons that because the QHP status of the tortious agent was the relevant inquiry—and ultimate source of MMA applicability—in *Baker*, then the QHP status of the agent is what always controls. However, *Baker* did not consider or speak to whether the agent is the *only* possible source of MMA applicability in vicarious liability claims.

{25} In respondeat superior, because liability is based on acts of the agent, one cannot hold a principal liable to a greater extent than it could hold the agent liable. *See* Restatement (Third) of Torts: Apportionment of Liability § 13 cmt. e (2000) ("The vicariously liable party is liable only for the share of plaintiff's damages for which the tortious actor is held liable."). In *Baker*, the claims were based on the acts of QHP physicians subject to the cap, so it was their status that was relevant to analyzing the MMA's applicability. *See* 2013-NMSC-043, ¶¶ 31-32. With respect

then to the QHP status of the professional corporations, the *Baker* Court explained that "any procedure to license or certify the corporation or organization to provide professional services would be redundant since, under the doctrine of respondeat superior, the legal organization as the passive tortfeasor is only liable to the extent of the legal liability of the individual medical professional who is the active tortfeasor." *Id.* ¶ 31. That is the core of the *Baker* Court's respondeat superior analysis. Ultimately, nothing in *Baker* prohibits Lovelace from the protections granted based on its status as a QHP in the vicarious liability claim brought by Plaintiff.

## III.   CONCLUSION

{26}    We hold that the plain language of the MMA demonstrates that the Act covers vicarious liability claims against QHPs, regardless of the QHP status of the agent, where the agent's conduct falls within the scope of Section 41-5-3(C). We reject Plaintiff's assertion that only providers listed in Section 41-5-3(A) can commit malpractice under the MMA. Accordingly, Lovelace, as a QHP, is entitled to the Act's benefits in the vicarious liability claims against it where the conduct of its employed registered nurses resulted in "medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately result[ed] in injury to the patient." Section 41-5-3(C).

{27}    **IT IS SO ORDERED**.

_____

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

_____

**JULIE J. VARGAS, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**C. SHANNON BACON, Justice**

_____

**BRIANA H. ZAMORA, Justice**