# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: November 28, 2018

**NO. A-1-CA-35807**

**NICHOLAS T. LEGER as PERSONAL
REPRESENTATIVE for the ESTATE OF
MICHAEL THOEMKE and DANIEL
THOEMKE, individually,**

Plaintiffs,

v.

**NICHOLAS T. LEGER as assignee
OF PRESBYTERIAN HEALTHCARE
SERVICES, and JOHN OR JANE DOES
1-5,**

Defendants/Third-Party Plaintiffs-Appellees,

v.

**RICHARD GERETY, M.D., and
NEW MEXICO HEART INSTITUTE,**

Third-Party Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY
Gerald E. Baca, District Judge**

The Vargas Law Firm, LLC
Ray M. Vargas, II
Albuquerque, NM

Carter & Valle Law Firm
Richard J. Valle
Criostoir O'Cleireachain
Albuquerque, NM

for Appellees

Lorenz Law
Alice T. Lorenz
Albuquerque, NM

Atwood, Malone, Turner & Sabin, P.A.
Lee M. Rogers
Carla Neusch Williams
Roswell, NM

for Appellants

**OPINION**

**VANZI, Chief Judge.**

{1}     This interlocutory appeal presents a question of first impression concerning assignment of claims for compensation covered by the Medical Malpractice Act (the MMA or the Act), NMSA 1978, §§ 41-5-1 to -29 (1976, as amended through 2015). In the litigation below, plaintiffs sued a hospital on claims subject to the MMA based, in part, on allegations of malpractice by a physician not employed by the hospital for which plaintiffs claimed the hospital was vicariously liable. After the hospital filed a third-party complaint for equitable indemnification against the physician and his employer, in compliance with the MMA's requirements concerning pre-filing review and decision by the Medical Review Commission, plaintiffs successfully moved for orders staying that action and preventing the third-party defendants from participating in discovery in plaintiffs' case against the hospital, arguing (among other things) that plaintiffs had chosen not to sue the third-party defendants and had no interest in the hospital's indemnification claim. Nevertheless, one plaintiff acquired the hospital's indemnification claim by assignment in settling plaintiffs' case against the hospital and then moved to lift the stay and take over as third-party plaintiff on that claim.

{2}     The question presented is whether the hospital's assignment of its indemnification claim to one of the plaintiffs is barred by the MMA's prohibition

against assignment of "[a] patient's claim for compensation under the [MMA,]" Section 41-5-12, or the common law. Applying New Mexico precedents concerning statutory construction—in particular, precedents construing the MMA—we conclude that the Legislature intended the MMA's requirements and restrictions to apply to all "malpractice claims" covered by the MMA and hold that Section 41-5-12 bars assignment of all "malpractice claims" for compensation covered by the MMA. One of these precedents, *Wilschinsky v. Medina*, 1989-NMSC-047, ¶ 26, 108 N.M. 511, 775 P.2d 713, held that "the [L]egislature intended to cover all causes of action arising in New Mexico that are based on acts of malpractice." Further, *Christus St. Vincent Regional Medical Center v. Duarte-Afara*, 2011-NMCA-112, ¶¶ 1, 14-20, 267 P.3d 70, made clear that the character of an indemnification claim under the common law as "separate and distinct from the underlying tort" does not control determination of whether the MMA's requirements and restrictions apply. Our statutory construction analysis is dispositive of this appeal, regardless of how a claim not covered by the MMA would be treated under the common law. Our conclusion concerning the assignment issue obviates the need to resolve other issues discussed by the parties.

**BACKGROUND**

{3}     This appeal arises from a complaint asserting claims for wrongful death, negligence, and medical malpractice filed by Nicholas T. Leger, as Personal

2

Representative for the Estate of Michael Thoemke, and Daniel Thoemke, individually (collectively, Plaintiffs), against Presbyterian Healthcare Services (PHS) after Michael Thoemke died at Presbyterian Hospital. Although the complaint did not name Dr. Richard Gerety as a defendant, it included allegations concerning Dr. Gerety's conduct in consulting on Michael's case while "acting within the course and scope of his employment, or acting as the agent or ostensible agent of [PHS.]" In answering the complaint, PHS admitted that Dr. Gerety consulted on Michael's case but denied allegations that Dr. Gerety was PHS's cardiothoracic surgeon and that Dr. Gerety acted within "the course and scope of his employment, or act[ed] as the agent or ostensible agent of [PHS]."

{4} After obtaining review and decision by the Medical Review Commission (as required for malpractice claims against a health care provider covered by the MMA, *see* §§ 41-5-5, -14, -15(A)) and the district court's leave to file, PHS filed a third-party complaint against Dr. Gerety and his employer, New Mexico Heart Institute (NMHI) (collectively, Appellants), stating, "[I]n the event that Dr. Gerety is found negligent in [this] suit, and in the event that PHS is found to be vicariously liable for the conduct of Dr. Gerety, then PHS is entitled to indemnification from [Appellants] for all fees, expenses, judgments, settlements and any and all other damages reasonably related to the alleged conduct of Dr. Gerety." In answering the third-party complaint, Appellants denied that Dr. Gerety was negligent and that

PHS "is vicariously liable for the alleged acts and omissions of Dr. Gerety" and alleged affirmative defenses.

{5}     Plaintiffs moved to sever or bifurcate and stay the third-party complaint, arguing (among other things) that PHS's suit "is contingent upon a jury first finding that PHS is liable for the death of Michael Thoemke, and that PHS's liability is based, in whole or in part, upon the acts or omissions of [Appellants]"; "Plaintiffs have no interest in the outcome of PHS'[s] common law indemnification claims"; "Plaintiffs should not be dragged into a dispute that does not involve them, and that is not yet perfected or ripe"; "[n]othing in the law requires Plaintiffs to sue those third parties and Plaintiffs here have chosen not to"; "Plaintiffs have no standing or interest in any post-judgment indemnification claims brought by PHS against third parties"; and the indemnification claim would not accrue unless Plaintiffs obtained a judgment against PHS. Plaintiffs also moved for a protective order from discovery propounded by Appellants, arguing again that Plaintiffs did not sue Appellants and "have no interest or stake" in the third-party action, and that PHS's indemnification claim had not accrued. The district court granted both motions, and denied PHS's later motion to reconsider the order granting severance and stay.

{6}     Plaintiffs ultimately settled their claims against PHS, and the district court dismissed those claims with prejudice. As part of that settlement, PHS assigned to

4

Nicolas T. Leger, as Personal Representative of the Wrongful Death Estate of Michael Thoemke:

> Any and all rights, claims, and causes of action of [PHS] against [Appellants] arising out of claims for indemnification, contribution, or any other rights or claims arising out of [PHS's] payment of defense fees, defense costs relating to claims of medical negligence against [Appellants], and payment of any amounts, including payments made in settlement to . . . Plaintiffs in the matter known as *Leger, et al. v. Presbyterian Healthcare Services*, . . . including the claims brought by [PHS] against [Appellants] in the May 21, 2013 [t]hird-[p]arty [c]omplaint for indemnification filed therein.

{7}     Following the settlement, Leger moved to lift the stay of PHS's third-party complaint and for leave to file an amended third-party complaint, stating, "Now that the underlying case is fully resolved, and the [t]hird [p]arty claims assigned to Leger, the time has come for the stay of the [t]hird [p]arty [a]ction to be lifted and that action to proceed to trial."

{8}     In separate responses, Appellants did not oppose the request to lift the stay but opposed the motion to amend (with NMHI adopting Dr. Gerety's arguments while asserting additional arguments). As relevant here, Dr. Gerety argued that the indemnification claim is "a claim for compensation under the [MMA]" and a "medical malpractice claim" that is "covered by all of the regulatory aspects of the [MMA]," and that Section 41-5-12 (prohibiting assignment of "[a] patient's claim for compensation under the [MMA]") should not be interpreted "to prohibit assignments only by patients" but to prohibit assignment of malpractice claims

5

governed by the MMA, consistent with legislative intent as interpreted by New Mexico case law. He also argued that the common-law prohibition against assignment of personal injury claims prohibits assignment; Leger cannot recover more than the maximum permitted by Section 41-5-6, and allowing Leger to recover on the indemnification claim would increase costs to the healthcare system; Leger's recovery on the indemnification claim is barred by public policy against double recovery; and having chosen not to present a claim to the Medical Review Commission (presentation requirement), not to sue Dr. Gerety, and to obtain an order severing and staying the third-party action, Leger should not be allowed to prosecute the claim after the expiration of the MMA's statute of repose (Section 41-5-13).

{9} Leger's reply to Dr. Gerety's response argued (among other things) that assignment is not barred because the assignment transferred "an interest in property and is common in commercial enterprises"; the indemnification claim, "while subject to provisions of the [MMA], is separate and distinct from the original claims of personal injury/bodily injury"; and the indemnification claim is not a "patient's" claim for compensation falling within the MMA's anti-assignment provision because PHS does not meet the MMA's definition of "patient" as "a natural person" under Section 41-5-3(E). Leger also argued that there would be no double recovery because the assignment gave Leger "the

6

property rights to any recovery PHS is entitled to" and "PHS has not obtained any recovery in this matter" and that neither the MMA's presentation requirement nor the MMA's statute of repose barred Leger's prosecution of the indemnification claim because PHS had satisfied both requirements and the proposed amendments to the third-party complaint were non-substantive changes that relate back to the original PHS filing.

{10} After the district court granted his motion, Leger, "as [a]ssignee of [PHS]," filed an amended third-party complaint, asserting that PHS is entitled to indemnification if Dr. Gerety is found negligent and PHS is found vicariously liable for Dr. Gerety's conduct, and that "PHS has paid out sums due to its vicarious liability for Dr. Gerety's actions and omissions and is therefore entitled to indemnification."

{11} Appellants moved to dismiss Leger's amended third-party complaint, arguing again that PHS's indemnity claim is a claim for compensation covered by the MMA's anti-assignment provision and common-law prohibition against assignment of personal injury claims and, even assuming a lawful assignment, the claim was barred by Leger's failure to comply with the MMA's presentation requirement and statute of repose. In opposing the motion, Leger reiterated his prior arguments that the assignment is not barred by the common law because the assignment did not transfer a personal injury claim but "an interest in an

7

equitable/monetary claim and is common in commercial enterprises" or prohibited by the MMA, and that the MMA's presentation requirement and statute of repose had been satisfied by PHS.

{12} Appellants also moved for summary judgment on the ground that Leger could not meet the requirements necessary to prevail on an indemnification claim, in part, because the settlement agreement with PHS did not discharge the liability of Appellants and so did not "buy peace" for them. In opposing that motion, Leger repeatedly stated that PHS intended "to discharge all tortfeasor liability to original Plaintiffs," including "for the actions of [Appellants,]" and that the "[r]elease discharges liability for the underl[y]ing tort concerning all agents (past, present, actual, ostensible and borrowed)." Leger stated further:

> Because PHS paid amounts to cover 100% of the underlying liability claim, original Plaintiffs could no longer maintain suit against [Appellants] in the underlying case. To do so would violate the principle against double recovery. *See Sunnyland Farms, Inc. v. Central New Mexico Elec. Co-op, Inc*.[,] 2013-NMSC-017, [¶ 47,] 301 P.3d 387 (["]In general, plaintiffs may not collect more than the damages awarded to them, or, put another way, they may not receive compensation twice for the same injury[."]). As such, when PHS settled the case for the entire value of the case, by operation of law, original Plaintiffs were precluded from bringing suit against other Defendants in the underlying tort claim . . . [and] once the original, underlying Plaintiffs could no longer maintain suit against [Appellants], [Leger and PHS were] entitled to seek indemnification. . . . [B]y operation of law, there is no more recovery available from [Appellants] to the original, underlying Plaintiff[s]. As a result of the extinguishment of [Appellants'] liability to the original, underlying Plaintiffs['] claims, [Leger and PHS are] now able to go forward with the indemnification claims.

8

Leger also stated that "[Appellants'] liability to the original, underlying Plaintiffs in the underlying case was discharged by operation of law" because Plaintiffs had not brought "direct claims against [Appellants]" within the statute of repose. The reply arguments of Appellants included the following:

> [T]he [c]ourt should not validate the assignment or allow Leger to circumvent the [MMA] by choosing not to sue Dr. Gerety, convincing the [c]ourt and Dr. Gerety that he had no interest in the indemnity action and excluding Dr. Gerety from participating in the underlying case, then extracting from PHS an[] assignment of its indemnity claim, all in order to collect 100% of his damages from PHS and then recover the same damages from Dr. Gerety. . . . To allow patients to obtain 100% of their damages from one healthcare provider, and then demand an assignment of that provider's indemnity claim against another provider, in order to allow the patient to obtain more than 100% of his damages, would frustrate the purpose of the Act and simply add to the overall cost of delivering health care as plaintiffs 'double dip' their claims.

{13}     The district court denied Appellants' motions in a letter decision. In denying the motion for summary judgment just discussed, the court stated that "[P]laintiffs, by settling with PHS and executing the [r]elease settled any and all claims that [P]laintiffs had against PHS, [Appellants] and, thereby 'bought peace' for [Appellants] as to all of the underlying claims brought by [P]laintiffs against PHS, Dr. Gerety and NMHI[.]" The court also stated that Leger's prosecution of the indemnification claim "will not violate the prohibition against double recovery as [P]laintiffs have fully recovered what they could for their claims" and the damages they seek to recover from Appellants through the assignment are "not for the

9

underlying claims brought by original [P]laintiffs, but for indemnification as a result of the damages PHS paid to [P]laintiffs for the negligence of [Appellants], which claim[s are] separate and distinct from the claims made by [P]laintiff[s] in the underlying cause of action[.]"

{14} In denying the motion to dismiss discussed above, the court stated that "the indemnity claims in this matter are assignable because they are not personal injury claims," but claims "separate and distinct from the underlying tort" and that the MMA's presentation requirement and statute of repose were satisfied by PHS. In a separate order, the district court certified for interlocutory review the "issues of whether . . . the common law and/or [Section] 41-5-12 . . . prohibits the assignment of an indemnity claim against a qualified healthcare provider." Appellants filed an application for interlocutory review, which this Court granted.

**DISCUSSION**

**A.    Principles of Statutory Construction**

{15} Statutory construction is a question of law that we review de novo. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 10, 309 P.3d 1047. "When construing statutes, our guiding principle is to determine and give effect to legislative intent." *Id.* ¶ 11 (internal quotation marks and citation omitted); *see State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 25, 117 N.M. 346, 871 P.2d 1352 ("[W]e believe it to be the high duty and responsibility of the judicial branch of government to

facilitate and promote the [L]egislature's accomplishment of its purpose—especially when such action involves correcting an apparent legislative mistake."); *see also In re Portal*, 2002-NMSC-011, ¶ 5, 132 N.M. 171, 45 P.3d 891 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals." (internal quotation marks and citation omitted)); *D'Avignon v. Graham*, 1991-NMCA-125, ¶ 11, 113 N.M. 129, 823 P.2d 929 (explaining that "the cardinal rule of statutory construction is to determine legislative intent" and that New Mexico courts "have rejected formalistic and mechanistic interpretation of statutory language").

{16} In performing this duty, we must consider the provisions at issue "in the context of the statute as a whole, including the purposes and consequences of the Act." *Baker*, 2013-NMSC-043, ¶ 15; *see State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 (stating that courts must analyze a "statute's function within a comprehensive legislative scheme" and may not consider subsections "in a vacuum" (internal quotation marks and citation omitted)); *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 14, 121 N.M. 764, 918 P.2d 350 ("[A]ll parts of a statute must be read together to ascertain legislative intent. We are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole." (citation omitted)).

{**17**}    "Rules of statutory construction dictate that when a statute's language is clear and unambiguous and it conveys a clear and definite meaning, the statute must be given its plain and ordinary meaning." *Key*, 1996-NMSC-038, ¶ 13. Our Supreme Court has admonished, however, that "courts must exercise caution in applying the plain meaning rule" because "[i]ts beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *Helman*, 1994-NMSC-023, ¶ 23; *see Baker*, 2013-NMSC-043, ¶ 15 (citing *Helman* for these "wise words of caution in applying the plain meaning rule").

{**18**}    *Helman* discussed at length the "plain meaning" and "rejection-of-literal-language" approaches to statutory construction, explaining that "the two approaches, correctly understood, can be viewed as complementary, not contradictory." 1994-NMSC-023, ¶¶ 1-3, 18-26. The Court affirmed that "if the meaning of a statute is truly clear—not vague, uncertain, ambiguous, or otherwise doubtful—it is of course the responsibility of the judiciary to apply the statute as written." *Id.* ¶ 22. "But where the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity or contradiction, the statute will be construed according to its obvious spirit or reason,

12

even though this requires the rejection of words or the substitution of others." *Id.* ¶ 3 (internal quotation marks and citations omitted). The Court explained:

> In such a case, it can rarely be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning. While . . . one part of the statute may appear absolutely clear and certain to the point of mathematical precision, lurking in another part of the enactment, or even in the same section, or in the history and background of the legislation, or in an apparent conflict between the statutory wording and the overall legislative intent, there may be one or more provisions giving rise to genuine uncertainty as to what the [L]egislature was trying to accomplish. In such a case, it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute.

*Id.* ¶ 23.

{19} The Court cautioned further, quoting from Judge Learned Hand "words which we believe provide the proper orientation that a court should bring to resolution of a dispute which turns on the purportedly plain meaning of a statute[:]"

> There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis. . . . As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final.

*Id.* ¶ 26 (internal quotation marks and citation omitted). Concluding that the statute at issue was ambiguous, despite "clarity and precision" in some aspects, *Helman* followed the "rejection-of-literal-language" approach to resolve the statutory

construction issue presented. *Id.* ¶¶ 3, 27-29; *see also Ortiz v. Overland Express*, 2010-NMSC-021, ¶ 21, 148 N.M. 405, 237 P.3d 707 (acting pursuant to the judicial "duty to effectuate legislative intent" to correct the Legislature's "apparent oversight" in having removed definitions; explaining that "[our Supreme] Court has consistently recognized that it is appropriate for the [j]udiciary to look beyond the plain meaning of the statute's language to effectuate legislative intent when the statute is ambiguous").

**B.     The MMA**

{20}     The MMA's stated purpose is "to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico." Section 41-5-2. As has been widely recognized, the MMA was enacted to address a perceived medical malpractice crisis in New Mexico by "providing a framework for tort liability with which the insurance industry could operate[,]" one that "restrict[s] and limit[s] plaintiffs' rights under the common law" through "several procedural measures and by establishing a limitation on full recovery for malpractice injury[.]" *Wilschinsky*, 1989-NMSC-047, ¶ 21; *see Cahn v. Berryman*, 2018-NMSC-002, ¶ 13, 408 P.3d 1012 (discussing concerns prompting the MMA's enactment); *Baker*, 2013-NMSC-043, ¶ 16 (same); *see also Roberts v. Sw. Cmty. Health Servs.*, 1992-NMSC-042, ¶ 15, 114 N.M. 248, 837 P.2d 442 ("[T]he Act established new

14

procedural and substantive restrictions on malpractice liability." (internal quotation marks omitted)). As our Supreme Court explained in *Baker*:

> To give effect to the purpose of the MMA, the Legislature created a balanced scheme to encourage health care providers to opt into the Act by conferring certain benefits to them, which it then balanced with the benefits it provided to their patients. The Legislature made professional liability insurance available to health care providers but conditioned availability to that insurance on a quid pro quo: health care providers could receive the benefits of the MMA only if they became qualified health care providers under the MMA and accepted the burdens of doing so.

2013-NMSC-043, ¶ 17 (alteration, internal quotation marks, and citation omitted).

{21} To be "qualified" under the MMA, a "health care provider," as defined by Section 41-5-3(A), must comply with the requirements of Section 41-5-5, including by establishing "financial responsibility" and paying a surcharge into the "patient's compensation fund" as described in Section 41-5-25. A health care provider who does not comply with the qualification requirements of Section 41-5-5 "shall not have the benefit of any of the provisions of the [MMA]." Section 41-5-5(C).

{22} The MMA expressly limits the aggregate amount recoverable "by all persons for or arising from any injury or death to a patient as a result of malpractice" to $600,000 "per occurrence," exclusive of punitive damages and medical care and related benefits. Section 41-5-6(A). It also provides that "[a]ny amount due from a judgment or settlement in excess of" the $200,000 statutory

15

limit on a healthcare provider's personal liability "shall be paid from the patient's compensation fund," Section 41-5-6(D), and that "the fund shall only be expended for the purposes of and to the extent provided in the [MMA,]" Section 41-5-25(A).

**C.      The MMA Does Not Clearly and Unambiguously Limit the Scope of the Prohibition Against Assignment of Claims for Compensation**

{23}      Section 41-5-12, provides that "[a] patient's claim for compensation under the [MMA] is not assignable." The MMA does not define "patient's claim for compensation" or "patient's claim." It does define "malpractice claim" (with exceptions not relevant here) to

> include[] any cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient, whether the patient's claim or cause of action sounds in tort or contract, and includes but is not limited to actions based on battery or wrongful death[.]

Section 41-5-3(C). And it defines "patient" as "a natural person who received or should have received health care from a licensed health care provider, under a contract, express or implied[.]" Section 41-5-3(E).

{24}      Leger contends that "the Act clearly and unambiguously sought to limit its prohibition against assignment of claims to claims of a 'patient,' as that term is defined in the Act." Leger's textual argument is that the indemnification claim he seeks to prosecute is PHS's claim, and because PHS is "a corporation and hospital" and not a "natural person," PHS is not a "patient" and, therefore, the

16

indemnification claim is not a "patient's claim." Even if the definition of "patient" is clear and unambiguous, that does not resolve the question of the Legislature's intent concerning application of Section 41-5-12's prohibition against assignment, especially given the absence of any definition of "[a] patient's claim" or "claim for compensation" separate from the definition of "malpractice claim," and the use of these terms in the context of the statute as a whole.

{25} Appellants contend that "patient's claim" and "malpractice claim" are used interchangeably in Section 41-5-3(C) (i.e., the provision defining "malpractice claim" as "includ[ing] any cause of action . . . which proximately results in injury to the patient, whether the patient's claim or cause of action sounds in tort or contract"), and that this reflects the Legislature's intent in Section 41-5-12 to treat "patient's claim" as the equivalent of "malpractice claim." Precedents discussed below, interpreting the MMA as governing a claim brought by a non-patient and a hospital's indemnification claim against a physician, notwithstanding the absence of statutory text specifically stating that such claims are subject to the MMA, arguably weaken Appellants' equivalence argument. Nevertheless, the phrase "whether the patient's claim or cause of action sounds in tort or contract" in Section 41-5-3(C) does suggest equivalence, and language used throughout the MMA reflects a statutory scheme addressing the liability of health care providers on claims arising in the first instance from "injury to the patient" resulting from

17

medical malpractice (Section 41-5-3(C)), and contemplating litigation commenced by a "patient" or a representative of the patient against a "health care provider."[1]

---

[1] *See* § 41-5-4 ("A patient or his representative having a malpractice claim for bodily injury or death may file a complaint in any court of law having requisite jurisdiction and demand right of trial by jury. . . . This section shall not prevent a patient or his representative from alleging a requisite jurisdictional amount in a malpractice claim filed in a court requiring such an allegation."); § 41-5-13 (discussing a "claim for malpractice arising out of an act of malpractice"); § 41-5-7(A) ("In all malpractice claims where liability is established, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits. . . . In actions upon malpractice claims tried to the court, where liability is found, the court's findings shall include a recitation that the patient is or is not in need of future medical care and related benefits."); § 41-5-7(B) (discussing a patient's future medical care and related benefits "once a judgment is entered in favor of a patient . . . or a settlement is reached between a patient and health care provider"); § 41-5-10(A) (entitling health care providers to have a physical examination of the patient); § 41-5-14(A) (creating medical review commission "to provide panels to review all malpractice claims against health care providers covered by the [MMA]"); § 41-5-11(A) (providing for apportionment of the amount "each defendant is obligated to pay" on a "judgment in favor of the patient" where the amount paid in advance "exceeds the liability of the defendant or the insurer making it"); § 41-5-15(A) ("No malpractice action may be filed in any court against a qualifying health care provider before application is made to the medical review commission and its decision is rendered."); § 41-5-21 ("No rule shall be adopted . . . which requires a party to make a monetary payment as a condition to bringing a malpractice claim before the medical review panel."); § 41-5-22 (discussing "[t]he running of the applicable limitation period in a malpractice claim"); § 41-5-23 ("In any malpractice claim where the panel has determined that the acts complained of were or reasonably might constitute malpractice and that the patient was or may have been injured by the act, the panel, its members, the director and the professional association concerned will cooperate fully with the patient in retaining a physician qualified in the field of medicine involved, who will consult with, assist in trial preparation and testify on behalf of the patient, upon his payment of a reasonable fee to the same effect as if the physician had been engaged originally by the patient.").

18

{26}     Although the text and context of the statute as a whole provides support for the proposition that the Legislature intended equivalence in the terms "patient's claim" and "malpractice claim," we conclude that the statute is ambiguous, and the question of the Legislature's intent concerning application of Section 41-5-12's prohibition against assignment cannot be answered based on the MMA's "literal language." In cases construing the MMA, our Supreme Court has recognized that the Legislature has, at times, been "simply imprecise with its language" and refused to "parse the Legislature's words in . . . a literal and mechanical manner" or to "rest [its] conclusions upon the plain meaning of the language if the intention of the Legislature suggests a meaning different from that suggested by the literal language of the law." *Baker*, 2013-NMSC-043, ¶ 30 (alteration, internal quotation marks, and citation omitted). We turn now to the analysis employed in precedents interpreting the MMA "in the context of the statute as a whole, including the purposes and consequences of the Act." *Id.* ¶ 15.

**D.     The Analysis Employed in Precedents Construing the MMA Requires the Conclusion That Leger's Indemnification Claim Is Subject to All MMA Restrictions, Including the Prohibition Against Assignment**

{27}     In *Wilschinsky*, our Supreme Court applied statutory-construction principles to the MMA, including consideration of legislative intent and policy implications, *see* 1989-NMSC-047, ¶¶ 21-26, where "the [L]egislature did not directly address potential recovery by third parties," *id.* ¶ 22; "[n]o language in the [MMA]

19

specifically addresses the issue of third-party recovery for an act of malpractice[,]" *id.* ¶ 20; and "the activity at issue falls neither within the articulated ambit of the statutory definition, nor within the ambit of the exclusion[,]" *id.* ¶ 24. In reaching its conclusion that "the [L]egislature intended to cover all causes of action arising in New Mexico that are based on acts of malpractice[,]" our Supreme Court explained that "[w]hen we find, as we do here, a clash between the intent of the [L]egislature and its own definitional section, we seek to harmonize the two." *Id.* ¶ 26.

{28}     *Wilschinsky* addressed the question whether the MMA applies to "claims based on malpractice asserted by non-patients against a physician who is qualified under the [MMA.]" *Id.* ¶ 1. In analyzing the definition of "malpractice claim" in the context of the MMA as a whole and the policy implications flowing from its interpretation, our Supreme Court noted several factors impacting the analysis, including the following: (a) "the nonmedical nature of the articulated exclusion in paragraph C [of Section 41-5-3] is at least some evidence the [L]egislature foresaw and intended broad application of the concept of a 'malpractice claim' "; (b) "if we recognize a third-party cause of action for the [plaintiffs] and it is not covered by the Act, a third party would be placed in a better position to achieve full recovery from an act of malpractice than would the patient malpracticed upon"; and (c) "the clear intent of the [L]egislature, as articulated in Section 41-5-2, was to make

20

malpractice insurance available to health care providers." *Wilschinsky*, 1989-NMSC-047, ¶ 25. Finding "compelling" the "underlying logic" of a Florida case reasoning that "the gravamen of the third-party action is predicated upon the allegation of professional negligence by a practicing physician[,]" *id.* ¶ 27 (internal quotation marks and citation omitted), our Supreme Court held that the third-party cause of action at issue "falls within the purpose of the [MMA] and should be pursued according to its guidelines[,]" *id.* ¶ 28.

{29}    In *Duarte-Afara* this Court followed *Wilschinsky*'s instruction that "a claim may be construed as a malpractice claim within the meaning of the MMA if 'the gravamen of the third-party action is predicated upon the allegation of professional negligence by a practicing physician'" in determining that "the gravamen of [the m]edical [c]enter's equitable indemnification claim is predicated upon the allegation that [d]octors negligently caused, and were partly liable for, [the patient's] injuries" and held that the medical center's equitable indemnification claim against doctors "is a malpractice claim as that term is used in the MMA" and is subject to the MMA's statute of repose. *Duarte-Afara*, 2011-NMCA-112, ¶ 15. "We reach[ed] this conclusion in part, so as to carry out the policy goals the Legislature intended by enacting the MMA and [its statute of repose,]" reasoning that, "[i]n effect, the [m]edical [c]enter's equitable indemnification claim exposes [d]octors to the identical liability to which they were subject under [the patient]'s

claims[,]" which "were properly dismissed as untimely." *Id.* ¶ 16. Permitting the equitable indemnification claim to proceed where the patient's claim could not would "elevate form over substance and frustrate the underlying concerns which motivated our Legislature to enact the MMA and [its statute of repose provision]." *Id.*

{30} *Duarte-Afara* recognized that an indemnification claim must allege that the defendant caused "*direct harm* to a third party," the liability for which harm was discharged by the party seeking indemnification, and that "a cause of action for indemnification is separate and distinct from the underlying tort." *Id.* ¶¶ 14, 18. Nevertheless, *Duarte-Afara* held that "the controlling inquiry in determining whether a claim constitutes a 'malpractice claim' under the MMA is merely whether the gravamen of the claim is predicated upon the allegation of professional negligence." *Id.* ¶ 18.

{31} In *Baker*, our Supreme Court interpreted the MMA's definition of "health care provider," which the plaintiffs contended did not include the business organizations under which the defendant doctors operated, "in the context of the statute as a whole, including the purposes and consequences of the Act." 2013-NMSC-043, ¶¶ 14-15. The Court concluded that "several provisions in the Act indicate that the Legislature intended professional medical organizations . . . to be covered by the Act," rejecting the plaintiffs' argument that the business

22

organizations at issue "are not entitled to qualify as 'health care providers' under the MMA" because they "do not fit into any" category included in Section 41-5-3(A)'s definition and "were not specifically included by the Legislature in any other part of the MMA[.]" *Baker*, 2013-NMSC-043, ¶¶ 1, 14, 31.

**{32}** Among other points made in the analysis, *Baker* stated that, "[i]n light of the Act's purpose, we can discern no reason why the Legislature would intend to cover individual medical professionals under the Act while excluding the business organizations that they operate under to provide health care" and that nothing in the MMA indicated legislative intent "to impair or eliminate the ability of physicians to practice under the umbrella of a professional entity." *Id.* ¶ 21 (internal quotation marks and citation omitted). The Court also rejected the plaintiffs' interpretation on the ground that it "conflicts with both the Legislature's stated purpose and its goal to assure that providers of health care are adequately covered in New Mexico[,]" stating that the Court would not "construe a statute to defeat its intended purpose." *Id.* (alteration, internal quotation marks, and citation omitted).

**{33}** In the years that have passed since these decisions issued, interpreting as within the MMA claims that fall outside the MMA's scope under a plain-language construction, the Legislature has taken no action to correct them.

23

{34}     Appellants argue that the analysis employed in these and other decisions construing the MMA support their position that Section 41-5-12 must be interpreted to prohibit assignment of all "malpractice claims" subject to the MMA, not just those claims assigned by a "patient." Leger attempts to distinguish these cases by characterizing them as having "read language and limitations into the Act that are not expressly stated in the Act[,]" "supplement[ing] the Act where the Legislature was silent[,]" while characterizing an interpretation of the anti-assignment provision that includes in its prohibition an indemnification claim based on medical malpractice as an attempt "to remove express provisions in the Act." He contends that "the relief sought by Appellants here would require this Court to engage in inappropriate judicial surgery to excise a key, defined term inserted by the Legislature into [S]ection 41-5-12." We disagree with these characterizations. Even assuming that Leger's inclusion-versus-excision characterization were accurate, it makes no difference to the analysis. As discussed, we must perform our "high duty and responsibility . . . to facilitate and promote the [L]egislature's accomplishment of its purpose—especially when such action involves correcting an apparent legislative mistake[,]" *Helman*, 1994-NMSC-023, ¶ 25, "even though this requires the rejection of words or the substitution of others[,]" *id.* ¶ 3 (internal quotation marks and citation omitted).

{35}     Leger also argues that the indemnification claim falls outside Section 41-5-12's prohibition on assignment because it is not, and is separate and distinct from, a personal injury claim under the common law, and the Legislature enacted Section 41-5-12 to codify a general common-law rule prohibiting assignment of personal injury claims. We do not agree.

{36}     Precedents interpreting the MMA establish that neither the MMA's literal language nor the character and treatment of a claim under the common law is dispositive of whether a claim is subject to the MMA's restrictions and limitations. If the MMA's literal language controlled, *Wilschinsky* would not have held that the MMA's restrictions and limitations apply to a non-patient's claim for injury resulting from medical malpractice, given statutory text defining "malpractice claim" as a cause of action arising from an "injury to the patient" and the absence of language that "specifically addresses the issue of third-party recovery for an act of malpractice." *Wilschinsky*, 1989-NMSC-047, ¶¶ 20-28; *see also Baker*, 2013-NMSC-043, ¶¶ 12-21 (rejecting argument that MMA does not apply to professional medical organizations not specifically identified in MMA's definition of "health care provider"). And if the common law's treatment of indemnification claims as "separate and distinct from the underlying tort" were dispositive of the question of the MMA's application to a claim, *Duarte-Afara* would not have held that the MMA's restrictions and limitations apply to a hospital's indemnification

25

claim against doctors based on "the gravamen of the claim [a]s predicated upon the allegation of professional negligence[,]" notwithstanding the "separate and distinct" nature of indemnification claims under the common law. 2011-NMCA-112, ¶ 18.

{37} In light of these precedents, we cannot agree that use of the word "patient" in Section 41-5-12 reflects the Legislature's intent to "codify" a general common-law rule prohibiting assignment of personal injury claims or that the common law's treatment of indemnification claims as "separate and distinct from the underlying tort" requires the conclusion that the Legislature specifically intended to limit application of the prohibition against assignment of claims covered by the MMA to claims falling within the common-law rule prohibiting assignment of personal injury claims. Given *Duarte-Afara*'s holding that the common law is not dispositive of the question whether a claim is subject to the MMA's restrictions and limitations, we see no basis for concluding that the common law is dispositive of whether and how particular MMA restrictions and limitations apply. While we presume that the Legislature was aware of existing law when it enacted the MMA, we also presume that the Legislature enacted the MMA to *change*, not to codify, the existing law. *See, e.g.*, *Incorporated Cty. of Los Alamos v. Johnson*, 1989-NMSC-045, ¶ 4, 108 N.M. 633, 776 P.2d 1252 ("We presume that the [L]egislature is well informed as to existing statutory and common law and does

26

not intend to enact a nullity, and *we also presume that the [L]egislature intends to change existing law when it enacts a new statute*." (emphasis added)); *State ex rel. Bird v. Apodaca*, 1977-NMSC-110, ¶ 12, 91 N.M. 279, 573 P.2d 213 ("We assume that the Legislature is well informed as to existing statutory and common law, and that *it does not intend to enact useless statutes*[.] Furthermore, *when the Legislature enacts a new statute we presume that it intended to change the law as it previously existed*." (emphases added) (citations omitted)).

**{38}** Following the rule that "the controlling inquiry in determining whether a claim constitutes a 'malpractice claim' under the MMA is merely whether the gravamen of the claim is predicated upon the allegation of professional negligence[,]" *Duarte-Afara*, 2011-NMCA-112, ¶ 18, we conclude that, where an indemnification claim constitutes a "malpractice claim" subject to the MMA, there is no basis for treating the common law as dispositive in determining how the MMA's restrictions and limitations apply to the claim. *Cf. Cahn*, 2018-NMSC-002, ¶¶ 24-25 (explaining that the dissent's contention that the Court should apply a "background statute of limitations" to resolve an issue not clearly addressed in the MMA "does not withstand scrutiny" because "our Legislature enacted the MMA and its statute of repose, in part, *to supplant the very background statute of limitations the dissent insists should control*" and that "*applying the background statute of limitations is, if anything, the result most inconsistent with the*

27

*Legislature's intentions* and the result most intrusive and susceptible to criticism based on separation of powers principles" (emphases added)).[2]

{39}    We also see no evidence of legislative intent to create subclasses of "malpractice claims," with some claims subject to some MMA restrictions and not subject to other restrictions. As discussed, the MMA defines "patient," but it does not define "patient's claim" or "patient's claim for compensation" as something different from a "malpractice claim." Nor is there any evidence of legislative intent to treat claims subject to the MMA differently depending on the holder of the claim at a given point in time. Leger's interpretation of Section 41-5-12 as prohibiting assignment only by a "patient" requires the conclusion that the non-patient in *Wilschinsky* could assign a claim a "patient" could not assign. The result would be an "unreasonable classification" contrary to the Legislature's intention "to cover all causes of action arising in New Mexico that are based on acts of malpractice." *Wilschinsky*, 1989-NMSC-047, ¶ 26; *see id.* ¶ 25 ("[I]f we recognize

---

[2] As noted, the MMA applies only to claims against qualified health care providers. *See* § 41-5-5(C) ("A health care provider not qualifying under this section shall not have the benefit of any of the provisions of the [MMA] in the event of a malpractice claim against it."); *Roberts*, 1992-NMSC-042, ¶ 9 ("[O]nly health care providers meeting the Act's qualifications, Section 41-5-5(A), may claim the benefits of the Act, Section 41-5-5(C)."). In malpractice cases in which the MMA does not apply, courts may determine that indemnification claims should be treated differently from what Leger refers to as "patient's claims." The question presented here concerns only treatment of indemnification claims subject to the MMA.

a third-party cause of action for the [plaintiffs] and it is not covered by the Act, a third party would be placed in a better position to achieve full recovery from an act of malpractice than would the patient malpracticed upon."); *see also Duarte-Afara*, 2011-NMCA-112, ¶ 16 (permitting equitable indemnification "claim to proceed where [the patient's] claim could not, would . . . elevate form over substance and frustrate the underlying concerns which motivated our Legislature to enact the MMA and [its statute-of-repose provision]"). If the Legislature enacted a statutory scheme "to cover all causes of action arising in New Mexico that are based on acts of malpractice" by a qualified health care provider, but with the intention of treating claims covered by the MMA differently depending on different criteria, it would have articulated those criteria, rather than providing a single definition of "malpractice claim." *Wilschinsky*, 1989-NMSC-047, ¶ 26.

**{40}** The foregoing analysis leads us to conclude that the Legislature intended the MMA's requirements and restrictions to apply to all "malpractice claims" covered by the MMA (which the indemnification claim at issue undisputedly is) and, accordingly, that Section 41-5-12 bars assignment of all "malpractice claims" for compensation covered by the MMA. Given the Legislature's intention "to cover all causes of action arising in New Mexico that are based on acts of malpractice[,]" *Wilschinsky*, 1989-NMSC-047, ¶ 26, and that "the controlling inquiry in determining whether a claim constitutes a 'malpractice claim' under the MMA is

29

merely whether the gravamen of the claim is predicated upon the allegation of professional negligence[,]" *Duarte-Afara*, 2011-NMCA-112, ¶ 18, we can discern no reason why the Legislature would intend to subject indemnification claims to every MMA restriction except one—Section 41-5-12's prohibition against assignment—especially when the result would be an "unreasonable classification" permitting non-patients to do something forbidden to a patient. *See Wilschinsky*, 1989-NMSC-047, ¶ 26; *Duarte-Afara*, 2011-NMCA-112, ¶ 16.

{41}     Appellants raise other concerns about the potential consequences of adopting Leger's interpretation of Section 41-5-12. Leger dismisses these concerns as a "wholly speculative and implausible[] parade of horribles that might someday arise from allowing the assignment of a claim under the Act[.]" But our judicial duty to determine and give effect to the Legislature's intent in the face of ambiguous text requires that we consider "the context of the statute as a whole, including the purposes and *consequences* of the Act." *Baker*, 2013-NMSC-043, ¶ 15 (emphasis added). And there are potential consequences of the interpretation Leger advances that raise legitimate grounds for concern; for example, opening the door to a method of "claim laundering" whereby what Leger refers to as a "patient's claim" may be transformed into a different claim through assignment as part of a settlement in which the patient recovers 100% of her damages for the malpractice of health care providers sued and not sued by the patient, which claim the "patient"

30

(or one acting on behalf of the "patient") may prosecute separately and, in the process, potentially recover more than 100% of her damages for the same malpractice alleged to have resulted in "injury to the patient." *See Duarte-Afara*, 2011-NMCA-112, ¶ 16 ("In effect, [the m]edical [c]enter's equitable indemnification claim exposes [d]octors to the identical liability to which they were subject under [the patient]'s claims.").

{42}     The amount of the settlement is not in the record. And we do not know what amount, if any, Leger might have recovered in the third-party action. But Leger has stated that "PHS paid amounts to cover 100% of the underlying liability claim," including "for the actions of [Appellants]." Although the MMA contains text indicating legislative intent to apportion amounts among qualified health care providers under certain circumstances, *see* § 41-5-11(A) (providing for apportionment of the amount "each defendant is obligated to pay" on a "judgment in favor of the patient" where the amount paid in advance "exceeds the liability of the defendant or the insurer making it"), and *Duarte-Afara* held that a hospital's indemnification claim against doctors is a claim subject to the MMA's restrictions, we see no indication that the Legislature intended to allow a "patient" (or one acting on behalf of the "patient") to prosecute indemnification claims and recover more than 100% of her damages for the same malpractice alleged to have resulted in "injury to the patient." And such a result seems contrary to the purposes for

31

which the MMA was enacted and the "balanced scheme" the Legislature created to implement it. *See Baker*, 2013-NMSC-043, ¶ 17; *Wilschinsky*, 1989-NMSC-047, ¶ 21.

{43} Although the district court certified only the assignment issue for interlocutory review, Appellants argued in their application and subsequent briefing that Leger's failures to present a claim against Appellants to the Medical Review Commission and file it within the MMA's statute of repose bar Leger from prosecuting the indemnification action. Our disposition of the assignment issue makes it unnecessary to reach those issues.

**E.      The Dissent**

{44} The dissent suggests that we have failed "to closely examine the words in the Act" and chosen instead to "depend[] on broad generalizations derived from the judiciary's added gloss in construing the MMA." Dissent Op. ¶ 59. The opinion discusses at length numerous principles of statutory construction articulated in New Mexico appellate decisions, including those applied in precedents interpreting the MMA, and considers the statutory text at issue in the context of the MMA as a whole before concluding that the MMA's plain text does not unambiguously answer the question presented.

{45} As for the opinion's consideration of precedents construing the MMA, we are obliged to follow them, along with precedents articulating and applying

32

principles of statutory construction. *Alexander v. Delgado*, 1973-NMSC-030, ¶¶ 9-10, 84 N.M. 717, 507 P.2d 778 (stating, in discussing the role of precedent, that "[n]o reason has been advanced which would justify [the Court of Appeals] in refusing to follow the New Mexico Supreme Court decisions" (internal quotation marks and citation omitted)). Furthermore, the treatise on statutory construction cited in the dissent states that "[t]he most conclusive statutory interpretations come from state court constructions of state statutes"; "[*j*]*udicial construction of a statute becomes part of the legislation from the time of its enactment*"; and "even an inferior court interpretation may be persuasive." 2B Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 49:4, at 20-22 (7th ed. 2012) (emphasis added).

{46}     We reject the dissent's view that a court interpreting statutory text that does not unambiguously answer the question presented may consider only the law in effect at the time of enactment. Dissent Op. ¶¶ 59, 62, 66. We do not suggest that the precedents discussed above unambiguously answer the question presented. But the opinion's analysis is most consistent with the statutory text and with what applicable precedents say about statutory construction and the MMA.

**The Plain-Language Argument**

{47}     The dissent argues that "we can and should give effect to the Legislature's choice of the words 'patient's claim' in Section 41-5-12[.]" Dissent Op. ¶ 58. After

33

concluding that "a 'patient's claim' is a natural person's cause of action under the MMA, arising from the health care that person received or should have received from a health care provider[,]" *id.* ¶ 60, the dissent asserts that "[t]he reference to 'patient's claim' within the definition of 'malpractice claim' does not . . . render the terms equivalent" because "[r]eading the definition in this way would render many of its words superfluous," *id.* ¶ 61.

{48}    As noted, the MMA does not define "patient's claim for compensation" or "patient's claim." And the dissent's reading itself renders superfluous the phrase "whether the patient's claim or cause of action sounds in tort or contract" in the MMA's definition of "malpractice claim" as "includ[ing] any cause of action arising in this state against a health care provider for medical treatment . . . which proximately results in injury to the patient, *whether the patient's claim or cause of action sounds in tort or contract*[.]" Section 41-5-3(C) (emphasis added). These words, and their placement, constitute at least some textual evidence that the [L]egislature understood a "malpractice claim" covered by the MMA as one that originates as a claim by a "patient" against a healthcare provider to which the Act applies. *Cf. Cummings v. X-Ray Assocs. of N.M.*, 1996-NMSC-035, ¶ 36, 121 N.M. 821, 918 P.2d 1321 ("A malpractice claim is an attempt by a patient to obtain something he or she does not yet possess: monetary compensation for an injury caused by the negligence of a health care practitioner."). The Legislature's choice

34

to use these words in Section 41-5-3(C) undermines the dissent's criticism of Appellants' argument that the Legislature had only " 'patient's claims' in mind when the MMA was enacted" as "contrary to the language in the Act." Dissent Op. ¶ 62. So too does the Legislature's choice to use language throughout the MMA (cited above in footnote one) reflecting a scheme to address (in ways that differ from the common law) claims arising from "injury to the patient" resulting from malpractice by a "health care provider" subject to the MMA (Section 41-5-3(C)), and contemplating litigation commenced by a "patient" or a representative of the patient against a "health care provider." *See, e.g.*, § 41-5-4 ("*A patient or his representative having a malpractice claim* for bodily injury or death may file a complaint in any court of law having requisite jurisdiction and demand right of trial by jury. . . . This section shall not prevent *a patient or his representative from alleging* a requisite jurisdictional amount *in a malpractice claim* filed in a court requiring such an allegation." (emphases added)).

{49} The argument that the Legislature intended equivalence between the undefined term "patient's claim" and the defined term "malpractice claim" is not frivolous, and the plain language does not resolve the issue presented free from all doubt. *See Helman*, 1994-NMSC-023, ¶ 23 (explaining that the "beguiling simplicity" of the plain language canon of construction "may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one

35

reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning"). Although we cannot say that the MMA's plain language unambiguously equates "patient's claim" with "malpractice claim," we can say that the plain text of the MMA, in the only provision that defines claims subject to the Act as well as in the Act as a whole, provides support for that interpretation. And while the MMA uses both "patient's claim" and "malpractice claim," the dissent's conclusion that "the language of the MMA supports a distinction between 'patient's claims' and 'malpractice claims,' " Dissent Op. ¶ 63, does not demonstrate, free of ambiguity, legislative intent to exclude from Section 41-5-12 every claim falling within the MMA's definition of "malpractice claim" except those held by a "patient" at the moment of assignment. *See Helman*, 1994-NMSC-023, ¶¶ 26-29 (noting the dangers of literal readings, instructing that "[a]s nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation[,]" and concluding that the statute at issue was ambiguous, despite "clarity and precision" in some aspects (internal quotation marks and citation omitted)); *Roberts*, 1992-NMSC-042, ¶ 17 (rejecting as "ignor[ing] a cardinal principle of statutory construction, i.e., that the Act should be read as a whole, giving effect to each portion of the statute" the argument that the Legislature acted "purposefully" in "omitt[ing] the word 'qualified' from the Act's statute of

36

limitations and that this omission indicates that the [L]egislature intended the statute to apply to all health care providers, regardless of whether the particular health care provider chose to become qualified" (citation omitted)).

{50} The dissent contends that judicial interpretation of a statute is "a thin reed upon which to lean in effectuating the legislative intent behind Section 41-5-12." Dissent Op. ¶ 67 (quoting *State ex rel. State Eng'r v. Lewis*, 1996-NMCA-019, ¶ 13, 121 N.M. 323, 910 P.2d 957, as stating that "[w]e must interpret the language of a statute as the [L]egislature understood it at the time it was enacted"). As noted, however, the treatise cited in the dissent teaches that "[t]he most conclusive statutory interpretations come from state court constructions of state statutes" and "[j]udicial construction of a statute becomes part of the legislation from the time of its enactment." 2B Singer, *supra*, § 49:4, at 20-21.[3] Also worth noting in this regard is the dissent's statement that "the Legislature doubtless did not have

---

[3] The dissent's citation to *Lewis*, 1996-NMCA-019, ¶ 16, in criticizing Appellants' arguments concerning the fiscal impact of an interpretation of Section 41-5-12 that permits assignment of indemnification claims seems misplaced. Dissent Op. ¶ 65. The Legislature is, of course, the governmental branch with the institutional capacity and competence to assess the fiscal impact of its enactments. But the statement in *Lewis* cited by the dissent on this point addresses "the consequences of a legislative policy embodied in an unambiguous statute[.]" *Lewis*, 1996-NMCA-019, ¶ 16. In this case, the text does not unambiguously answer the question presented. Yet it remains "the high duty and responsibility of the judicial branch of government to facilitate and promote the [L]egislature's accomplishment of its purpose[,]" *Helman*, 1994-NMSC-023, ¶ 25, and to do so by considering Section 41-5-12 "in the context of the statute as a whole, including the purposes and consequences of the Act[,]" *Baker*, 2013-NMSC-043, ¶ 15.

*Wilschinsky*-type claims in mind when it enacted Section 41-5-12 in 1976 because these claims were not recognized by our Supreme Court until 1989." Dissent Op. ¶ 67. Although the observation makes sense as a temporal matter, it undermines the dissent's insistence on an intended distinction between "patient's claim" and "malpractice claim" based, in part, on language used in Section 41-5-3(C)'s definition "indicat[ing] that 'malpractice claim' is wide sweeping, encompassing *all* causes of action against a health care provider based on acts of malpractice that proximately result in injury to the patient." Dissent Op. ¶ 61. If the Legislature did intend to distinguish "patient's claim" from any other claim constituting a "malpractice claim" and to provide different treatment for different types of claims falling within the definition of "malpractice claim," it was capable of doing so, as the dissent asserts in its argument concerning the Legislature's language choices. It seems entirely plausible that the Legislature's use of "patient's claim" in Section 41-5-12 represents another instance in which the Legislature was "simply imprecise with its language." *See Baker*, 2013-NMSC-043, ¶ 30.

**Arguments Concerning "Legal Reality," Common Law, and Policy**

{51}    The dissent's assertions concerning "the legal reality in which the MMA was adopted," Dissent Op. ¶ 62, and "the common law when the MMA was enacted," Dissent Op. ¶ 66, do not answer the question presented. There is no dispute that "[a]round the time the MMA was enacted, indemnity and contribution claims

38

certainly were litigated in the medical malpractice context." Dissent Op. ¶ 62. Nor is there a dispute concerning the assignability of "choses in action" under the common law. Dissent Op. ¶ 66. But the question we are charged with answering is what the Legislature intended in enacting the MMA, not what was litigated in the medical malpractice context when the MMA was enacted or what was—and is— allowed under the common law. As the opinion notes, the MMA applies only to claims against qualified health care providers. Section 41-5-5(C); *Roberts*, 1992-NMSC-042, ¶ 17. This means that cases involving allegations of medical malpractice against health care providers not qualified under the MMA will be litigated under the common law, with claims against government actors subject to the limitations and restrictions of the Tort Claims Act, NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2015). *See, e.g.*, *Maestas v. Zager*, 2007-NMSC-003, ¶¶ 16-18, 141 N.M. 154, 152 P.3d 141. Although the Legislature provided incentives for health care providers to satisfy the requirements necessary for the MMA to apply, there are medical malpractice cases to which the MMA does not apply. There is no dispute that the MMA applies to this case; the question is whether the MMA permits assignment of malpractice claims not held by a "patient" at the time of assignment.

{52} The dissent states that "the majority assumes that the non-assignability provision is a benefit that inures to health care providers" and that it is "a false

39

premise that the non-assignability provision is a restriction" because "the non-assignability provision has not been identified by our courts as a benefit to health care providers" and "this provision seems designed not to benefit health care providers but to *protect* patients." Dissent Op. ¶ 64. Section 41-5-12 plainly reads as a restriction or limitation. Nevertheless, there is no reason to believe that the MMA confers no "benefits" other than those mentioned in *Baker*. Furthermore, even if the common law's proscription against assignment of personal injury claims is meant to benefit plaintiffs in cases litigated under the common law, this does not require the conclusion that the Legislature did not intend Section 41-5-12 to benefit health care providers in cases to which the MMA applies. *See Roberts*, 1992-NMSC-042, ¶ 14 (disagreeing that in "arguably" codifying a common law rule in the MMA, "the [L]egislature did not intend to confer a 'benefit' on qualified health care providers[,]" explaining that the argument erroneously assumes that "the [L]egislature mechanistically enacted the common law and, thus, did not confer a benefit on qualified health care providers" when "it is equally plausible that the [L]egislature, in response to the perceived medical malpractice crisis, chose the time of the negligent act rule specifically to confer its benefit on qualified health care providers").

{53}     We are aware of the principles cited by the dissent concerning interpretation of statutes against the background of the common law. As the opinion notes,

however, we also presume that the Legislature enacted the MMA to *change*, not to codify, the existing law. *See Johnson*, 1989-NMSC-045, ¶ 4; *Bird*, 1977-NMSC-110, ¶ 12; *cf. Cahn*, 2018-NMSC-002, ¶¶ 24-25. An interpretation of the MMA that incorporates everything allowed under the common law unless expressly prohibited seems incompatible with a scheme clearly intended to limit common-law rights, recoveries, and the costs of health care in New Mexico. *See, e.g.*, *Roberts*, 1992-NMSC-042, ¶ 15 ("[T]he Act established new procedural and substantive restrictions on malpractice liability." (internal quotation marks omitted)); *Wilschinsky*, 1989-NMSC-047, ¶ 21 (stating that the MMA was enacted to address a perceived medical malpractice crisis in New Mexico by "providing a framework for tort liability with which the insurance industry could operate[,]" one that "restrict[s] and limit[s the] plaintiffs' rights under the common law" through "several procedural measures and by establishing a limitation on full recovery for malpractice injury"); *see also Salopek v. Friedman*, 2013-NMCA-087, ¶¶ 50-58, 308 P.3d 139 (discussing some differences between medical malpractice claims under the MMA and under the common law). It is also at odds with the conclusion of *Duarte-Afara,* reached "in part, so as to carry out the policy goals the Legislature intended by enacting the MMA" that an indemnification claim is subject to the MMA's restrictions and limitations, notwithstanding its "separate and distinct" identity under the common law. 2011-NMCA-112, ¶¶ 16, 18. Such an

41

interpretation seems especially unwarranted given that medical malpractice cases to which the MMA does not apply will be litigated under the common law.

{54} The dissent's comments that "the approach taken by our Court today appears to stand alone" and "no published opinions . . . forbid such assignment," Dissent Op. ¶ 69, carry no significance. Our task is to interpret the MMA, and not one of the cases cited as supporting the conclusion reached in the dissent (none of which were cited by Leger) involves the MMA or even another state's statute with the same language and goals. As for the policy considerations discussed in the dissent's cited cases, Dissent Op. ¶ 69, the policies relevant here are the policies the Legislature intended to implement and serve in enacting the MMA. *Safeway, Inc. v. Rooter 2000 Plumbing & Drain SSS*, 2016-NMSC-009, ¶ 38, 368 P.3d 389; *Torres v. State*, 1995-NMSC-025, ¶ 10, 119 N.M. 609, 894 P.2d 386 ("[I]t is the particular domain of the [L]egislature, as the voice of the people, to make public policy."). The dissent offers no reason why the policies discussed in the cases cited—favoring "free alienability of property interests," settlement, and windfalls benefitting plaintiffs—should control the MMA's interpretation. *See* Dissent Op. ¶ 68. There is also no reason to presume that the Legislature intended the MMA to serve the policies invoked in the dissent regardless of potential consequences. For example, would an interpretation of the MMA based on a policy of "free alienability of property interests" allow Leger to re-assign the indemnification

42

claim he obtained from PHS based on the reasoning that, having undergone a process of transmutation in the manner effected in this case, the claim is not a "patient's claim"? Could that re-assigned claim be litigated many years beyond the MMA's statute of repose based on the reasoning that PHS complied with the MMA's presentation requirements before asserting the indemnification claim in court? Or would re-assignment be barred because the holder of the claim at the moment of re-assignment was a "natural person"?

{55} Again, we do not suggest that the opinion's interpretation of the Legislature's intent in enacting Section 41-5-12 is free from doubt—it cannot be, given that the plain text does not unambiguously answer the question. *Cummings*, 1996-NMSC-035, ¶ 45 ("It is rare, if not impossible, for any language—statutory or otherwise—to be utterly free from ambiguity."). We believe, however, that our reading of this provision in the context of the MMA as a whole best comports with the principles of statutory construction stated and applied in prior precedents, most especially in those precedents interpreting the MMA in other contexts.

**CONCLUSION**

{56} We reverse the district court's denial of Appellants' motion to dismiss at issue in this appeal (motion to dismiss filed by Appellants on grounds that indemnity claim is not assignable and that claim is barred by the statute of repose)

43

and remand with instructions that Leger's indemnification action be dismissed with prejudice.

{57}     **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Chief Judge**

**I CONCUR:**

_____
**HENRY M. BOHNHOFF, Judge**

**JENNIFER L. ATTREP, Judge (dissenting).**

**ATTREP, Judge (dissenting).**

{58}     Because I believe we can and should give effect to the Legislature's choice of the words "patient's claim" in Section 41-5-12, I conclude that the assignment of the equitable indemnification claim[4] to Leger is not barred by the MMA. The majority having concluded to the contrary, I respectfully dissent.

{59}     The issue here is whether the Legislature intended to differentiate between "malpractice claims" and "patient's claims" in the MMA such that the use of the latter term in Section 41-5-12 (the non-assignability provision) was meant to restrict the assignability of only certain types of malpractice claims—namely, "patient's claims." Asserting ambiguity in the Act, the majority relies heavily on general principles derived from *Wilschinsky*, *Duarte-Afara*, and *Baker* in determining equivalence between "patient's claim" and "malpractice claim" and in determining that, notwithstanding language to the contrary, the Legislature meant for the non-assignability provision to apply to *all* malpractice claims. Majority Op. ¶¶ 26-32, 39-40. I think it crucial to closely examine the words in the Act before depending on broad generalizations derived from the judiciary's added gloss in

---

[4] As noted at oral argument and reflected in the second amended third-party complaint for indemnification or contribution, the claim at issue on appeal may actually be a contribution claim, not an indemnity claim. Because this distinction does not affect my analysis and because the parties in their briefing and the majority in its opinion refer to Leger's claim as an indemnification claim, I do the same.

construing the MMA. This best ensures that we "interpret the language of a statute as the [L]egislature understood it at the time it was enacted." *Lewis*, 1996-NMCA-019, ¶ 13. In doing so, I conclude the words selected by the Legislature require a different result than the majority. And it is incumbent upon this Court to give such words effect, as they are the "primary indicator of legislative intent[,]" if doing so does not result in "injustice, absurdity or contradiction[.]" *Baker*, 2013-NMSC-043, ¶ 11 (internal quotation marks and citation omitted); *see id.* ¶¶ 1, 13 (undertaking fulsome textual analysis and disagreeing with this Court's conclusion that the text of the MMA literally excluded certain entities from the definition of "health care provider").

{60} Turning to the statutory language in the Act, the non-assignability provision provides: "A patient's claim for compensation under the [MMA] is not assignable." Section 41-5-12. "Patient's claim" or "patient's claim for compensation" is not a defined term in the MMA, but "patient" is defined as "a natural person who received or should have received health care from a licensed health care provider, under a contract, express or implied[.]" Section 41-5-3(E). To determine the meaning of "patient's claim," I look to the ordinary meaning of the word "claim." *See State v. Ogden*, 1994-NMSC-029, ¶ 24, 118 N.M. 234, 880 P.2d 845 ("The words of a statute, including terms not statutorily defined, should be given their ordinary meaning absent clear and express legislative intention to the

46

contrary."). A "claim" is "[a]n interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; cause of action." *Black's Law Dictionary* 302 (10th ed. 2014). Thus, a "patient's claim" is a natural person's cause of action under the MMA, arising from the health care that person received or should have received from a health care provider.

{61} Turning next to the definition of "malpractice claim," the majority's equivalence argument breaks down. Under the MMA, " 'malpractice claim' *includes any* cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient, whether the patient's claim or cause of action sounds in tort or contract, and includes but is not limited to actions based on battery or wrongful death[.]" Section 41-5-3(C) (emphasis added). The use of the words "includes" and "any" at the beginning of the definition indicates that "malpractice claim" is wide sweeping, encompassing *all* causes of action against a health care provider based on acts of malpractice that proximately result in injury to the patient. *Cf. State v. Strauch*, 2015-NMSC-009, ¶ 37, 345 P.3d 317 (noting that "the word 'includes' implies an incomplete listing" (internal quotation marks and citation omitted)); *Mueller v. Sample*, 2004-NMCA-075, ¶ 16, 135 N.M. 748, 93 P.3d 769 (reading "any cause

47

of action or suit" to include claims filed both by the plaintiff and the defendant even though contractual term referred only to the defendant); *Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/any (last visited on Oct. 28, 2018) (defining "any" to mean, among other things, "one, some, or all indiscriminately of whatever quantity . . . all"). The reference to "patient's claim" within the definition of "malpractice claim" does not, in my opinion, render the terms equivalent. Reading the definition in this way would render many of its words superfluous. *See Baker*, 2013-NMSC-043, ¶ 24 ("[T]he Legislature is presumed not to have used any surplus words in a statute; each word is to be given meaning[,]" and we "must interpret a statute so as to avoid rendering the Legislature's language superfluous." (alteration, internal quotation marks, and citation omitted)).

{62} Appellants' related assertion at oral argument that it was "inconceivable" that the Legislature had anything other than "patient's claims" in mind when the MMA was enacted is not only contrary to the language in the Act, but also is contrary to the legal reality in which the MMA was adopted. *See State ex rel. King v. B & B Inv. Grp.*, 2014-NMSC-024, ¶ 38, 329 P.3d 658 (stating that the appellate courts operate "under the presumption that the [L]egislature acted with full knowledge of relevant statutory and common law and did not intend to enact a law inconsistent with existing law" (alterations, internal quotation marks, and citation

48

omitted)). Around the time the MMA was enacted, indemnity and contribution claims certainly were litigated in the medical malpractice context. *See* Uniform Contribution Among Tortfeasors Act, NMSA 1978, §§ 41-3-1 to -8 (1947, as amended through 1987); *Dessauer v. Mem'l Gen. Hosp.*, 1981-NMCA-051, ¶ 1, 96 N.M. 92, 628 P.2d 337 (contribution/indemnity suit brought by hospital and nurse against doctor); *Goffe v. Pharmaseal Labs., Inc.*, 1976-NMCA-123, ¶ 14, 90 N.M. 764, 568 P.2d 600 (mentioning cross-claim against doctor and hospital), *aff'd in part, rev'd in part*, 1977-NMSC-071, 90 N.M. 753, 568 P.2d 589. In simple terms, such claims involve causes of action between or among health care providers based on acts of malpractice that resulted in injury to a patient—that is, they are "malpractice claims" within the meaning of the MMA.[5] *See Dessauer*, 1981-NMCA-051, ¶¶ 26-29 (stating that in order to hold doctor liable for contribution, doctor must be determined negligent and to hold doctor liable for indemnity, doctor must be vicariously liable for nurse's negligence); *see also Caglioti v. Dist. Hosp. Partners, Lp*, 933 A.2d 800, 816 (D.C. 2007) (equating equitable indemnity

---

[5] Our holding in *Duarte-Afara* made it clear that equitable indemnification claims fall under the ambit of the MMA and are "malpractice claims." 2011-NMCA-112, ¶ 15. This conclusion was reached, in part, by resort to *Wilschinsky*. *Duarte-Afara*, 2011-NMCA-112, ¶ 15. While I believe it was unnecessary for our Court to go much beyond the statutory language of the MMA in reaching this conclusion, the outcome of *Duarte-Afara* is sound. Our decision in *Duarte-Afara* does not however, as Appellants imply, mean that the Legislature could not have had in mind such claims when drafting the MMA.

49

claim to malpractice claim and providing that, to recover, indemnitee "would have the burden of proving the applicable standard of care, a deviation from that standard and a causal relationship between the deviation and the injury"); *Faden v. Robbins*, 450 N.Y.S.2d 238, 239 (N.Y. App. Div. 1982) ("To be entitled to contribution from the third-party defendants, [the doctor] will have to establish that what the third-party defendants did or failed to do in their treatment of [the] plaintiff constituted a departure from the applicable standards of medical skill and care." (alteration, internal quotation marks, and citation omitted)).

{63}    And perhaps it too simple a point to make, but the Legislature clearly was capable of using the term "malpractice claim" in the MMA when it chose to do so. Other than defining "malpractice claim," the Legislature used that term sixteen times in the MMA. *See* §§ 41-5-3(C), -4, -5(C), -6(C), -7(A), -8, -14(A), -17(H), -21, -22, -23, -25(A). Had the Legislature intended that all malpractice claims be non-assignable, it could have used the term "malpractice claim" in Section 41-5-12. *See State v. Greenwood*, 2012-NMCA-017, ¶ 38, 271 P.3d 753 ("The Legislature knows how to include language in a statute if it so desires." (alteration, internal quotation marks, and citation omitted)). It did not. Given that the language of the MMA supports a distinction between "patient's claims" and "malpractice claims," I think we ought to give effect to the Legislature's choice of words—

namely, that the non-assignability provision applies to "patient's claims" and not to *all* "malpractice claims" as the majority concludes.

{64} Giving effect to the specific language in the non-assignability provision is not inconsistent with the legislative intent behind the MMA, nor would it lead to an absurd or unreasonable result. *State v. Marshall*, 2004-NMCA-104, ¶ 7, 136 N.M. 240, 96 P.3d 801 ("In construing the statute, our primary goal is to give effect to the intent of the Legislature. We do this by giving effect to the plain meaning of the words of statute, unless this leads to an absurd or unreasonable result." (citation omitted)). The stated purpose of the MMA is "to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico." Section 41-5-2. The majority posits that it "can discern no reason why the Legislature would intend to subject indemnification claims to every MMA restriction except one"—the non-assignability provision. Majority Op. ¶ 40. In making this contention, the majority assumes that the non-assignability provision is a benefit that inures to health care providers. Unlike the other "restrictions" in the MMA—such as the damages cap, Section 41-5-6, and statute of repose, Section 41-5-13—the non-assignability provision has not been identified by our courts as a benefit to health care providers. *See Baker*, 2013-NMSC-043, ¶ 18 (listing benefits in the Act to health care providers). And, indeed, this provision seems designed not to benefit health care

51

providers but to *protect* patients. *See Quality Chiropractic, PC v. Farmers Ins. Co. of Ariz.*, 2002-NMCA-080, ¶ 10, 132 N.M. 518, 51 P.3d 1172 ("The main concern . . . was that assignment of personal injury claims would lead to unscrupulous trafficking in litigation as a commodity."); *see also Kimball Int'l, Inc. v. Northfield Metal Prods.*, 760 A.2d 794, 803 (N.J. Super. Ct. App. Div. 2000) ("The prohibition against the assignment of tort claims is designed to protect the interests of injured persons, not alleged tortfeasors who may have claims against other alleged tortfeasors."). As such, I think it a false premise that the non-assignability provision is a restriction—or benefit to health care providers—that should apply equally to all malpractice claims.

{65} Appellants' legislative intent argument also is unavailing. While Appellants speculate that permitting the assignment of indemnity claims runs contrary to the legislative intent of the MMA because assignment will make it more likely for these claims to be litigated and, thereby, drive up the costs of insuring health care providers, the opposite may also be true. It seems just as likely that the overall effect of limiting the assignability of indemnity claims may make settlements more difficult to obtain—resulting in lengthier and more expensive litigation, thereby driving up the costs of insuring health care providers. *See Bush v. Super. Ct. of Sacramento Cty.*, 13 Cal. Rptr. 2d 382, 389 (Cal. Ct. App. 1992) ("Sanctioning the assignment of [equitable indemnification] chose in action to the tort plaintiff

52

fosters settlement with the tortfeasor most willing to settle."); *Caglioti*, 933 A.2d at 816 ("Although in this instance the assignment of the equitable indemnity claim perhaps has prolonged the litigation, in other instances the assignment could provide an additional means of settling the underlying case."); *Rubenstein v. Royal Ins. Co. of Am.*, 696 N.E.2d 973, 975 (Mass. App. Ct. 1998) ("[A]n assignment of the right of contribution encourages settlement."); *cf. Gonzales v. Atnip*, 1984-NMCA-128, ¶ 1, 102 N.M. 194, 692 P.2d 1343 ("The historical and current public policy of this state is to favor the settlement of disputed claims[, including] . . . the settlement of lawsuits." (citation omitted)). Frankly, this fiscal impact analysis is beyond the expertise of the judiciary and should be left for the Legislature to examine and make appropriate changes to the MMA if need be. *See Lewis*, 1996-NMCA-019, ¶ 16 (leaving for the Legislature to address "potential problems created by our statutory interpretation" of clear and unambiguous provision).

**{66}** There also is no inherent absurdity in the Legislature prohibiting assignments of "patient's claims" with no corresponding prohibition against the indemnity claim at issue in this case. Section 41-5-12 was in line with the common law when the MMA was enacted. *Cf. San Juan Agric. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 20, 150 N.M. 64, 257 P.3d 884 ("When [the courts] interprets statutes, we do so against a background of common-law principles."). At the time of enactment, it was long established that, as a general

53

principle, "choses in action are assignable," the pertinent exception being personal injury claims. *Parker v. Beasley*, 1936-NMSC-004, ¶ 10, 40 N.M. 68, 54 P.2d 687; *see Quality Chiropractic*, 2002-NMCA-080, ¶ 8 (stating that "[p]ersonal injury claims . . . remained unassignable" even when assignment of other claims was permitted over time); 6A C.J.S. Assignments § 42 (2016) ("[A] chose in action, whether arising in tort or contract, is generally assignable, since a chose in action constitutes personal property." (footnote omitted)); *see also Emp'rs Fire Ins. Co. v. Welch*, 1967-NMSC-248, ¶ 5, 78 N.M. 494, 433 P.2d 79 (mentioning assignment of an indemnity claim). Under these principles, a patient's claim, which is a personal injury claim, would not be assignable, but an indemnity claim, which remains distinct from the underlying tort, would be assignable. *See Duarte-Afara*, 2011-NMCA-112, ¶ 18. The MMA as written maintains this common law distinction. *See San Juan Agric. Water Users Ass'n*, 2011-NMSC-011, ¶ 20 ("We presume that the Legislature enacts statutes that are consistent with the common law and that the common law applies unless it is clearly abrogated.").

{67}    To support its construction of the Act, the majority relies on an "unreasonable classification"—i.e., that if Section 41-5-12 is applied only to "patient's claims," then *Wilschinsky*-type claims (which are personal injury claims) would be assignable while patient's claims would not. Majority Op. ¶¶ 39-40. But the Legislature doubtless did not have *Wilschinsky*-type claims in mind when it

54

enacted Section 41-5-12 in 1976 because these claims were not recognized by our Supreme Court until 1989. *See Wilschinsky*, 1989-NMSC-047, ¶¶ 5-17. The assignment of such personal injury claims would be barred at common law, and there is no countervailing legislative intent in Section 41-5-12 to abrogate this principle. *See San Juan Agric. Water Users Ass'n*, 2011-NMSC-011, ¶ 20 ("A statute will be interpreted as supplanting the common law only if there is an explicit indication that the [L]egislature so intended." (internal quotation marks and citation omitted)). Regardless, the majority's "unreasonable classification," having been created by the judiciary, seems like a thin reed upon which to lean in effectuating the legislative intent behind Section 41-5-12. *Cf. Lewis*, 1996-NMCA-019, ¶ 13 ("We must interpret the language of a statute as the [L]egislature understood it at the time it was enacted.").

{68} It is worth highlighting that the majority opinion entirely eliminates the right to assign any and all malpractice claims falling within the MMA. Before brushing aside the free alienability of property interests, I think we ought to require a clearer expression of legislative intent than what we have here. *See San Juan Agric. Water Users Ass'n*, 2011-NMSC-011, ¶ 20; 2B Singer, *supra*, § 50:1, at 149-51 ("Absent an indication that a legislature intends a statute to supplant common law, courts should not give it that effect."); *see also State ex rel. Bingaman v. Valley Sav. & Loan Ass'n*, 1981-NMSC-108, ¶ 13, 97 N.M. 8, 636 P.2d 279 ("At common law,

55

restraints on alienation were prohibited."); *cf. Espinosa v. United of Omaha Life Ins. Co.*, 2006-NMCA-075, ¶ 27, 139 N.M. 691, 137 P.3d 631 (noting that "anti-assignment clauses are generally disfavored").

**{69}** Finally, the approach taken by our Court today appears to stand alone. Of the few courts that have specifically examined the assignability of indemnity and contribution claims to the original plaintiff in the medical malpractice context, I have found no published opinions that forbid such assignment. *See, e.g.*, *Bush*, 13 Cal. Rptr. 2d at 384-90 (permitting assignment of indemnity or contribution claims against medical providers to original plaintiff, noting strong preference for assignability, and rejecting double recovery arguments); *Caglioti*, 933 A.2d at 807-17 (same); *Robarts v. Diaco*, 581 So. 2d 911, 915 (Fla. Dist. Ct. App. 1991) (same); *cf. Kimball Int'l*, 760 A.2d at 803 (permitting assignment of indemnification claim to the plaintiff in products liability case). These courts address similar concerns raised by the majority regarding the potential for manipulation of claims by a plaintiff in order to obtain double recovery. The courts conclude that the possibility of a recovery in excess of tort damages does not bar assignment of an indemnification claim because, as a matter of policy, a windfall, if any, should benefit the injured plaintiff rather than a tortfeasor. *See Bush*, 13 Cal. Rptr. 2d at 390; *Caglioti*, 933 A.2d at 814-15; *Robarts*, 581 So. 2d at 915. These policy considerations counsel in favor of permitting the assignment in this case,

particularly in light of the fact that, because the amount of Plaintiffs' damages and the settlement amount are not of record, it is unclear that Plaintiffs will obtain full recovery if the assignment of the indemnity claim is disallowed.

**{70}** For the foregoing reasons, I would affirm the district court's denial of Appellants' motion to dismiss.[6]

_____
**JENNIFER L. ATTREP, Judge**

---

[6] I have limited my analysis to the issue addressed by the majority opinion and do not address the additional arguments raised by the Appellants, including the assignability of the indemnity claim under the common law and Leger's compliance with Sections 41-5-13 and -15.